Sullivan,
No. 4457.

CLARENCE W. KING *v.* BLUE MOUNTAIN FOREST ASSOCIATION.

JOHN L. MEYETTE *v.* SAME.

Argued April 3, 1956.

Decided May 31, 1956.

*William E. Nolin* and *Richard F. Upton* (*Mr. Upton* orally), for the plaintiffs.

*Burns, Calderwood & Bryant, Robert E. Hinchey* and *John C. Fairbanks* (*Mr. Hinchey* orally), for the defendant.

Kenison, C. J. This case poses the problem as to what remedies exist in this state by statute or at common law for damage to property allegedly caused by wild animals. The four counts in each declaration present different grounds of liability but certain historical background is common to all counts.

The defendant corporation was organized in 1891 by Austin Corbin, "under chapter 152 of the General Laws, for the purpose of enabling him to conveniently manage the park owned by him, consisting of about 25,000 acres of land, including Croydon and Grantham mountains, all fenced and stocked with wild animals, located in the towns of Newport, Cornish, Croydon and Grantham, in establishing and maintaining which he expended in the vicinity of half a million dollars." *Blue Mt. Forest Ass'n* v. *Borrowe,* 71 N. H. 69. Included among the animals imported into Corbin park

were Prussian wild boar from the Black Forest of Germany. See Baynes, Wild Life in the Blue Mountain Forest, ch. X (1931). Generally the boar could survive the climate of this state only if fed in the winter. Champollion, Blue Mountain Forest and its Animals, *pp.* 15, 59 (1899). By special act of the Legislature the defendant was given special game privileges within the park upon the erection of a fence enclosing the entire area. Laws 1895, *c.* 258; *State* v. *Griffin*, 69 N. H. 1, 30. Section 1 of that statute provided that "all fish, birds, and game of, in, or upon" the park "shall be the property" of the defendant, its successors or assigns. The Blue Mountain Forest Association is the only one to have imported wild boar into the northeastern part of the United States and they are not indigenous to the North American continent. According to Champollion, *supra,* 61, "It is in looking for worms and roots that the boar tears up the ground with his snout. At the time when the boar were most numerous in the Forest, there was hardly an acre in the open, that had not somewhere been rooted up or the grass trampled down by boar." Champollion fixes the life span of the boar to 20 to 30 years, so that those boar presently inhabiting the Forest must be of the fourth or fifth generation of the animals originally imported into Corbin Park.

Beginning in 1938, and thereafter from time to time, some boar escaped from the park. It is alleged that the escaped boar and their progeny, bred and born during the period of their escape, caused damage to the plaintiffs' lands and crops, which damage was characteristic of wild boar as a class and normally expected of them if at large. It is also alleged that several years prior to the trespasses in September 1954, the boar and their progeny had from time to time passed back and forth from the defendant's park on to land of others, through holes in the fenced enclosure and that the boar habitually returned to defendant's enclosure for the winter or at seasons of food shortage to be fed or cared for by the defendant.

I. The first count in the declaration is in trespass predicated on the common-law liability of an owner or possessor for trespass to real estate by his livestock. Restatement, Torts, *s.* 504. At an early date it was firmly established in this state that the owner or possessor of livestock was liable for such trespass irrespective of negligence. *Noyes* v. *Colby*, 30 N. H. 143; *Blaisdell* v. *Stone*, 60 N. H. 507; *Kennett* v. *Durgin*, 59 N. H. 560. This rule of strict liability for animal trespasses to real estate is still in effect in many of the eastern states today and "the tendency has been to re-

store the common law rule, either by statute or by decision." Prosser, Torts (2nd *ed.* 1955), *p.* 320. There has been no legislative attempt to modify this doctrine and it is still the law in this state. *Ellis* v. *Blue Mt. Forest Ass'n*, 69 N. H. 385; *Morse* v. *Railroad*, 66 N. H. 148. See *Howland* v. *Cressy*, 95 N. H. 205, 207. It is significant that section 4 of Laws 1949, *c.* 294 (RSA 467:6) provides that the remedy for trespass under the statute was not intended to supersede any remedy available at common law. As already indicated, strict liability for animal trespasses to real estate was firmly established in the jurisprudence of this state prior to the enactment of this statute.

If a farmer who owns or possesses contented cows is held to strict liability for trespass to real estate it would be a strange doctrine that would not impose at least the same liability upon the owner of battering boar which were imported into the state for the purposes of exclusive and private hunting. Whether the damage to the plaintiffs' real estate was caused by a wild boar that escaped or by its progeny born after its escape, which also belonged to the defendant (Laws 1895, *c.* 258), is not determinative of its liability for trespass. Winfield on Tort (6th *ed.* 1954) *p.* 646, states that there is no English decision on the duration of an owner's liability but suggests that if the wild animal is not indigenous it should continue until someone assumes permanent control of it. See also, Restatement, Torts, *s.* 507, *comment* d. Williams, Liability for Animals (1939), *p.* 337. The present situation has some parallel to *Brackett* v. *Company*, 87 N. H. 173, where the defendant was held liable for trespass by flooding the plaintiff's land and the damages were increased by the breeding of muskrats thereon even though this may not have been strictly foreseeable. We conclude that the demurrer to the first count in the plaintiffs' declaration should be overruled.

II. The fourth count of the declaration is in case but alleges no negligence. It is predicated on the theory that the possessor of wild animals is held to a standard of strict liability. It is conceded that there is no case in this jurisdiction imposing strict liability for damage to persons or property by escaped wild animals but it is urged that a rule should be adopted in this state following the Restatement of Torts, section 507, which reads as follows: "Except as stated in *ss.* 508, 517, a possessor of a wild animal is subject to liability to others, except trespassers on his land, for such harm done by the animal to their persons, lands or chattels as

results from a dangerous propensity which is characteristic of wild animals of its class or of which the possessor has reason to know although he has exercised the utmost care to confine the animal or otherwise prevent it from doing harm." Section 508 relates to indigenous wild animals after their escape and section 517 relates to wild animals kept in pursuance of a public duty, neither of which sections are applicable to this case.

It is true that strict liability for the keeping of dangerous wild animals is supported by a large number of jurisdictions and that the English courts have regarded this liability as a mere phase and specific application of the rule in *Rylands* v. *Fletcher*, (1868) L. R. 3 H. L. 330. See Prosser, Selected Topics in the Law of Torts, *pp.* 159, 160 (1953); anno. 69 A. L. R. 500. However some recent cases have shown a tendency to impose liability only for negligence. *Vaughan* v. *Wild West Show*, 109 W. Va. 170; *Panorama Resort* v. *Nichols*, 165 Va. 289. While some of the older text writers have summarized the law in favor of strict liability (Ingham, Law of Animals (1900); Robson, The Principles of Legal Liability for Trespasses and Injuries by Animals (1915) ), it is significant that the most recent definitive treatise has criticized the rule of strict liability as it prevails in England. Williams, Liability for Animals (1939). Likewise it has been pointed out in a careful analysis that many of the cases which have been decided on the basis of strict liability could have been decided on the basis of negligence. McNeely, A Footnote on Dangerous Animals, 37 Mich. L. Rev. 1181.

An examination of the cases in this state definitely indicate a clear tendency to limit strict liability to those cases where the Legislature has provided for it (*State* v. *Railroad*, 99 N. H. 66) or to those situations where the common law of the state has imposed such liability and the Legislature has not seen fit to change it. In the leading case of *Brown* v. *Collins*, 53 N. H. 442, the doctrine of *Rylans* v. *Fletcher, supra,* was entirely repudiated. The doctrine "was received with a triple bath of ice water . . . " in New Hampshire, New York and New Jersey. Prosser, Torts (2nd *ed.* 1955) 332. The *Collins* case has been followed consistently in this jurisdiction and there has been no indication that, apart from statute, strict liability would be imposed in cases involving blasting (*Crocker* v. *Company*, 99 N. H. 330, 333), or in cases involving dangerous domestic animals. *Login v. Waisman,* 82 N. H. 500. In the recent case of *Sleeper* v. *Company*, 100 N. H. 158, liability

for injuries received from an exhibitor's caged hyena was decided on the basis of negligence and not on the basis of absolute liability. *Reynolds* v. *Hussey*, 64 N. H. 64, which speaks in terms of duty and contributory negligence, did not establish a rule of absolute liability for dangerous domestic animals. Inasmuch as we have never adopted Restatement of Torts, *s.* 509, which imposes liability for harm done by dangerous domestic animals "although the possessor has exercised the utmost care to prevent it," there is no reason to adopt it in the case of wild animals unless we are to overrule *Login* v. *Waisman, supra.* In view of the consistent policy evidenced by an unbroken line of decisions in this state which, with the exception of cases of cattle trespass to real estate, impose liability at common law for negligence only, we do not now adopt a rule of absolute liability for injuries to persons and property caused by wild animals, as a general principle of law. The demurrer to the fourth count of the declaration should be sustained.

III. The third count in the declaration is an action of trespass based on the statute, RSA 467:3-6. This statute which was Laws 1949, *c.* 294, an act relating to the extermination of wild boar in the counties of Sullivan and Grafton, reads as follows: *"Whereas* certain persons and corporations have introduced into this state the wild boar, a dangerous animal, whose proclivities to damage property or injure persons are well known; and

*"Whereas* said wild boar, in certain localities, have been permitted to run at large and to increase and multiply in number, creating a public nuisance;

*Be it enacted by the Senate and House of Representatives in General Court convened:*

"1. ENCLOSURE. Any person or corporation owning or possessing wild boar in this state shall at all times keep such wild boar in a safe and suitable enclosure so that they may not run at large or damage the person or property of others.

"2. ABATEMENT. Any person or corporation owning or having introduced wild boar into this state who, heretofore, shall have suffered, permitted, or otherwise failed to prevent, the escape of such wild boar shall abate, at his or its own expense, the public nuisance resulting therefrom on or before April 1, 1950 by employing all reasonable means to capture or exterminate such wild boar and their progeny. Persons suffering damage to their lands, property or person after April 1, 1950 caused by wild boar now at large as specified in this paragraph and which are not captured or extermin-

ated as herein provided within the specified time limit, may recover such damage in an action of trespass against the said owner, or person or corporation having introduced the same into this state.

"3. LIABILITY. Any person or corporation owning or possessing wild boar in this state, who shall violate the provisions of section 1, shall be liable in an action of trespass for all damage done by said wild boar to the lands, properties or persons of others.

"4. NATURE OF REMEDY. The remedies created and duties imposed by this act shall be deemed cumulative and are not intended to modify or supersede any remedy available or duty imposed at common law.

"5. TAKES EFFECT. Section 3 of this act shall take effect April 1, 1950 and sections 1, 2 and 4 shall take effect upon the passage of this act.

[Approved July 22, 1949.]"

The declaration alleges that the defendant failed to keep the wild boar in a safe and suitable enclosure between April 1, 1950, and the date of the trespass in September 1954. It also alleges that the defendant failed to employ all reasonable means to capture and destroy the wild boar and their progeny which were at large on July 22, 1949, from then to the date of the trespass. The statute directed the defendant in July 1949, to abate a "public nuisance" in the then future and before April 1, 1950, and imposed liability on it for failure to do what was directed. This is not a retrospective law which is prohibited by Part I, Article 23rd of the New Hampshire Constitution. The police power of the state to control matters which are or may be considered nuisances is extremely broad. "The instances are numerous in which acts and things not nuisances at common law, and in themselves harmless and inoffensive or even beneficial, and only liable to become offensive to the public health or comfort by improper use, have been by statute declared nuisances. Such legislation, whenever brought in question, has been sustained by the courts." State v. Griffin, 69 N. H. 1, 27. See also, State v. Hutchins, 79 N. H. 132.

We do not know the number of wild boar that have escaped from Corbin Park or the number presently at large. The statute is not unconstitutional merely because the problem might have been solved by the state paying bounties for the capture of wild boar. Nor is the statute unconstitutional merely because a different remedy could have been devised such as directing the Fish & Game Department to kill wild boar as was done in the case of elk in the

same general area to avoid "a potential threat to agriculture (sic) interests." Laws 1955, *c*. 43. The Legislature has decided that the defendant's actions, although originally lawful and authorized, have now disturbed the equilibrium of a section of the state and that the defendant is the responsible cause so that it should have the burden of correcting the situation. Contrary to the views of many jurisdictions we do not as a matter of judicial policy impose absolute liability for damage by wild animals. *Cf. Andrews* v. *Andrews*, 242 N. C. 382; *Farrer* v. *Nelson*, 15 Q. B. D. 258 (1885); Williams, Liability for Animals (1939) ch. XIV; 34 N. C. L. Rev. 155 (1955). However, we cannot say that the state is powerless to adopt the view of absolute liability for damage by wild boar as a legislative policy. The statute (RSA 467:3-6) is constitutional and the demurrer to the third count in the declaration should be over-ruled.

IV. The second count in the plaintiffs' declaration is in trespass predicated on the theory that the wild boar are "reclaimed" wild animals for whose acts the defendant is responsible. Reliance is placed on the Irish case of *Brady* v. *Warren*, [1900] 2 Ir. Rep. 632, where the defendant was held liable for damage to adjoining property caused by a herd of deer which the defendant kept in an enclosure which had fallen in disrepair, so that the deer passed in and out of the enclosure. However, in that case the deer were tame and it is not authority for holding that boar which are both wild and dangerous (*Kelly* v. *Wade*, (1848) 12 Ir. L. R. 424, 430), and to which title is not lost by their escape, are in the class of reclaimed animals. *Cf. Ulery* v. *Jones*, 81 Ill. 403. The demurrer to the second count of the declaration should be sustained.

The plaintiffs' declaration states a cause of action for trespass to real estate and for trespass under the statute. The demurrer to counts one and three should be overruled and to counts two and four should be sustained.

*Remanded.*

All concurred.