WILLIAM L. CRUNK, APPELLEE, V. KENNETH GLOVER, APPELLANT.

95 N. W. 2d 135

Filed February 20, 1959. No. 34463.

*Wellensiek & Morrissey,* for appellant.

*Tyler & Frerichs,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The gist of the statements of appellee as a basis for the recovery of damages because of the asserted negligence of appellant is as follows: Appellant is and has

been for several years the owner and operator of a sale barn near Nebraska City where public sales of livestock and merchandise have been conducted. Livestock is placed in pens in the barn which the public is permitted to pass and is invited to inspect prior to when it is offered for sale. Appellant on and prior to August 3, 1957, kept a bear in one of the pens. It was, as appellant knew, untamed, savage, vicious, and dangerous, and when confined its natural propensity for mischief and viciousness was intensified. Appellant failed to confine the bear other than in the pen which had openings large enough that it could put its jaw and forelegs through them and contact anyone passing through the barn or standing near the pen. Appellee at about 1:15 p. m., August 3, 1957, was in the west portion of the part of the sale barn where the pens were located observing the unloading of livestock not owned by him. The livestock moved toward appellee in the aisle or passageway in which he was standing and he was forced to move to one side. He was without knowledge or notice that there was a bear on the premises. He stepped to the west near a wooden pen and while facing toward the east placed his right hand on the pen near the northeast corner to support himself. Immediately the bear, without warning, viciously seized and bit off the end of the third finger of the right hand of appellee. The injury and damages suffered by him were proximately caused by the negligence of appellant consisting of his failure to confine the animal in such a manner as to prevent it from injuring any person, including appellee, outside the enclosure where it was kept; his keeping the bear in a situation on the premises which did not prevent it from coming in contact with anyone properly on the premises; and his failure to provide effective and reasonable precaution to protect the public, including appellee, from the vicious and dangerous proclivity of the bear and the hazards involved in the location and manner of the confinement of the bear. Appellee was a

farmer 67 years of age. The first phalange of the right third finger of appellee was amputated. He, because of his injury, experienced pain, suffering, and permanent disability. He was compelled to incur expense for medical and hospital services and for the service of other persons to perform work in the farming operations of appellee which he was prevented from doing because of his injury. He asked the recovery of damages in a specified amount.

The answer of appellant denied the claims of appellee and specifically denied that appellant was a keeper of the bear at any of the times specified by appellee. The new matter asserted by appellant was that the bear was a domesticated animal, peaceful, gentle, friendly, and companionable. It was confined on August 3, 1957, in a pen the only exposed side of which was covered with wire mesh screen with openings of about one-half inch on which was a sign which plainly and readily gave notice to all persons of the presence of the bear in the pen. There were proper safeguards provided by appellant for the protection of all persons who might be near to the pen from injury by the bear. The pen containing the bear was in an area of the sale barn where it was not necessary for any person attending a sale to go to inspect livestock which would be offered for sale. Appellee was a trespasser in the area, knew the bear was there, placed his finger in the opening of the enclosure to play with it, and because thereof received the alleged injuries of which he complains. Any injuries appellee suffered were caused by his negligence consisting of his placing himself in a position of peril, placing his finger in the side of the pen where it could be reached by the bear, and his failure to observe and heed the notice of the presence of the bear.

The reply of appellee denied the contents of the answer except statements thereof not in conflict with matters appellee had alleged, and asserted that the wire mesh screen was only on a part of the front of the pen where

the bear was kept, did not extend to the corners of the front of it or on either side of it, and the portion which was screened had the screen on the inside of the wooden pen where it was not visible to anyone passing the pen and was not visible to appellee.

The verdict was for appellee. The motion for new trial by appellant was denied and judgment was rendered in accordance with the verdict. This appeal seeks to defeat the judgment.

The record contains substantial evidence tending to sustain the verdict and judgment. Appellant and his wife were the owners of a sale barn, hereafter referred to as the barn, for about 10 years before the incident which is the basis of this action. The manager of the barn was appellant. A public sale was generally conducted in it each Saturday commencing at 12:30 p. m. and occasionally a sale was held there more frequently than once each week. The sales were generally advertised in the Nebraska City daily paper and by other mediums. The public was invited to the place of business of appellant to inspect the property to be offered for sale and to attend the sale thereof. The property offered and sold consisted primarily of machinery, livestock, and articles of merchandise. The livestock was confined in pens in the barn before the sale commenced and it was subject to inspection by anyone who desired to do so. There had been no restriction on anyone entering and being in any part of the barn on the day of any sale before it was commenced or during the sale. The management had invited the pubic to do the things mentioned and never prohibited anyone from doing so except when it was temporarily necessary because of moving livestock from one location in the barn to another and to and from the sale ring where they were sold. The invitation by the management to the public to enter and move about in the barn had been accepted and enjoyed by many persons.

The front of the barn was to the south. There was a

door in the south end of the barn located about the middle of it from east to west. It opened in what is spoken of in the record as an aisle or alleyway. It will be called an alley herein. It was about 8 feet wide and extended from the south door to the north part of the barn. It ended at the south wall of a cattle pen which extended north to the north wall of the barn. There was a passageway from the alley toward the northwest between the southwest corner of the cattle pen spoken of above and the northeast corner of the pen in which the offending bear, which was an actor in the happening that occasioned this litigation, was confined. This passageway extended to two loading docks with a small pen between them located in the northwest area of the barn. The livestock brought to the barn was unloaded by use of the docks and the small pen between them was used to confine any animal desired to be temporarily isolated for some purpose. The pens for the hogs were east of the alley in the southeast area of the barn except the last hog pen was divided and the west part of it was used to retain small calves. The pens in which cattle were confined were north of the hog pens and in the northeast part of the barn. The cattle pens extended to the north wall of the barn and were all east of the alley. Adjacent to the alley on the west extending from the south end of the barn to the south wall of the bear pen were three office rooms; a space for the auction box, the auctioneer, and the scale man; and a space for the indoor scale. The sale ring and the seats for persons attending the sale were to the extreme west in the sale barn. West of the pen in which the bear was kept was an office for the veterinarian.

The south wall of the bear pen was about 10 feet long, the west wall was about 9 feet long, and the east wall was 5 feet long. There was a diagonal or northeast wall from the end of the east wall northwest to near the north end of the west wall. The space between the northwest end of the diagonal wall and the west wall was

occupied by a gate. The floor of the bear pen was concrete. The top of it was a solid floor of an area above it in which hay and feed were stored. The south and west walls of the pen were made of lumber and the east wall was metal. They had no openings. The diagonal or northeast side of the pen was fitted with a fence or wall made of 2 x 6's spiked to supports. The first 2 x 6 was about 2 inches above the concrete floor. The opening between the first and second 2 x 6 was about 2½ inches and the succeeding spaces between the timbers increased until the last one near the top was about 5 inches in width. The inside of the 2 x 6's was covered with hailstone wire with openings of one-half inch except it did not extend entirely to the northwest part of the northeast wall. The space where it was absent was about 2 feet wide at that end. There was an opening at the northeast corner of the pen about 30 inches from the floor. It was 2 inches wide and 4 inches long. This was to accommodate a slide-board latch about 1 inch wide and 12 inches long used to fasten a swinging gate of a pen north and east of the bear pen when the gate was fully opened. It was by this means fastened at the northeast corner of the bear pen when the gate was fully opened. There was a sign on a plywood board about 11 inches wide at one end and 14 or 16 inches wide at the other end which was fastened near the top of the northeast wall on the outside of the pen 7 or 7½ feet from the floor. There were written on the board by use of a red crayon usually utilized to mark cattle in letters 3 inches in height the words: "Bear—Danger." There was no other information concerning the bear being on the premises attached to or within the premises except that which might have been deduced from the character of the enclosure in which the bear was confined. The bear was black and weighed about 300 pounds.

Appellee had been at the barn and in the back part of it and had attended sales there probably two dozen times

throughout the years before he suffered the injury he complains of in this case. He went to the barn at about 12:30 the afternoon of Saturday, August 3, 1957, for the purpose of ascertaining if he could purchase a young calf. He knew there was to be a sale there that afternoon. He went to the south door. It was in two parts. The lower part was closed and latched. It was not locked. He entered and proceeded north down the alley to the pen where calves were generally yarded. There were 5 or 6 calves in the pen. He looked them over and then viewed some hogs and went farther north in the area. In the back part of the barn he saw some stock that was being unloaded into the barn. There were no baby calves of the kind he was looking for among the stock. When he ascertained this he started back towards the south door. He had gone some distance when he stopped, laid his hand on something he thought was a wall, and at the same time something grabbed him. He said immediately in the hearing of men standing nearby in the area: "What they got in that pen?" and the men, or one of them, said: "There's a bear in there." Appellee looked down and said: "Well, he just bit my finger off." Appellee was immediately taken to a doctor.

There was no sign at the south door and appellee saw no sign on or in the barn that day. He had probably been in the barn and in the parts that he visited that day as many as 24 times on different occasions and each time he had seen persons in the building near where the bear was kept. He had seen on each visit from one to as many as a dozen persons appearing to be inspecting stock and engaged in conversation. There were several men in the alley when the bear injured appellee August 3, 1957. It was quite dark around where the bear was kept. Appellee had no notice, information, or knowledge that there was a bear kept in the barn at any time until after he was injured August 3, 1957, when someone nearby in answer to the inquiry what was in the pen stated that there was a bear in there.

The wire attached to the northeast wall of the bear pen did not extend entirely to the northwest end of it. It lacked doing so by about 2 feet and there was no wire on the gate at the northwest part of the pen. There were openings in the material of which the gate was made. At the northeast corner of the bear pen there was a space between the wire and the east metal wall. It was 2 inches wide and 4 inches long and about $2\frac{1}{2}$ feet from the floor. It was at that place appellee had his hand when he thought he was putting it on a wall and when he was injured. Appellee made an inspection of the barn on, he thinks, Monday, August 5, 1957. That was when he learned about the opening in the wire on the northeast wall of the pen, the wire on the northeast wall of the pen, the sign attached to that wall, and many other facts concerning the pen in which the bear was kept. He then learned the sign that was posted on the wall was of a character and in such a position that it would probably not have been seen by anyone a stranger to it by walking past it in the passageway along the diagonal side of the pen. If one had approached the side of the pen from the northeast it is probable the sign might have been seen. The distance of it from the floor made vision of it improbable to one who had no knowledge it was there. When appellee, his attorney, and Ernest Davis were near the northeast corner of the pen on August 5, 1957, the bear put one of his feet through the opening in the wall above described and raked it down one of the legs of Ernest Davis. He was then standing about 1 foot or $1\frac{1}{2}$ feet from the wall of the pen.

A witness testified he was at the barn June 16, 1957, to remove some pigs and a calf he bought the day before. He was there about 8:30 or 9 o'clock in the forenoon. It was Sunday and there was no one in the barn. When he opened a gate to let the stock out of the pen in which they were yarded he stepped back and as he did so something grabbed him by one of the legs of his pants.

He looked in the pen which was behind him and saw the bear there. The witness was probably a foot from the bear pen. He did not know that there was a bear in the barn. The bear caused a couple of scratches on the leg of the witness. He had no way of knowing whether the bear was being playful or desirous of doing damage.

There was testimony that a witness heard an employee of appellant on August 3, 1957, between 11:30 a. m. and 12 noon state to two men, strangers to the witness, who were walking towards the bear pen to stay away from it because the bear had been vicious lately. The witness said the bear had been making a lot of noise in the pen on that occasion.

The bear was purchased at the barn from a stranger by Russell Glover in the latter part of October 1956. He was the owner of the bear while it was kept at the barn. He bought the feed and he cared for the bear. When he could not do so he arranged for Rose Schalk to feed and look after the bear. Russell Glover was a trucker. He owned and operated his trucks. He also raised and sold Shetland ponies. He owned 40 of them. He was not, insofar as the record shows, interested in any way in the barn operated by appellant. Russell Glover arranged with appellant for permission to confine the bear in the barn and keep it there until he made other arrangements. The bear was, with the knowledge and consent of appellant, kept in the barn from the time it was purchased in October of 1956 until it was disposed of in October 1957. Appellant secured or permitted his picture to be taken with the bear a week or 2 weeks after it was purchased. He was shown in the picture feeding the bear the contents of a bottle by holding the bottle so that the bear could consume its contents. The bear was trained to some extent. It was said the bear could perform 16 tricks. Appellant at various times during the period when the bear was kept in the barn exhibited it in the sale ring during sales

for the entertainment of the persons attending them. This was done to create good public relations and liven up the bidding at the sale. Appellant said he had fun with the bear. It apparently enjoyed drinking pop from a bottle. When appellant had a bottle the bear would follow him without a leash or anything of that nature. Appellant told of a special sale of new merchandise brought by a man from Omaha. The sale got "draggy." The sale was interrupted and appellant equipped himself with a bottle of pop and the bear followed him to the sale ring and performed for the sale attendants. There was an employee of appellant who showed the bear on a few occasions in the sale ring. The bear was not led or controlled by a collar, chain, rope, or any equipment of that kind. It was always led or controlled with a bottle of pop. The bear was useful to the business, according to the testimony of appellant. He said people were interested in seeing anything of that nature which was attractive and that is helpful to business. It helps solve the problem of getting people to attend the sales. There were many people who came to the barn to see the bear.

The finger of appellee that was injured on August 3, 1957, is referred to in the record as the index finger, the third finger, and the fourth finger of his right hand. It was the finger on the right hand that was next to his little finger. It was severed at the distal or last joint. Appellee called on his doctor immediately following the accident, was sent to a hospital, lockjaw serum was administered to him, and his hand was operated on that afternoon. The operation consisted of cutting back the bone sufficiently to get covering of the end of the amputated finger and closing the finger in a proper manner. The danger of inflammation or infection in the injured membrane from the bite of an animal was much greater than from a cut in the flesh. The injured member was treated and dressed 7 times from the date of the injury to September 13, 1957. The doctor

examined the hand 4 days before the trial of this case was commenced.

Appellee experienced inflammation in the finger. This resulted in stiffness in the surrounding area and this has an influence on the strength of the hand as long as the infection persists in the finger which is demonstrated by the presence of stiffness. Appellee was not able to bring the affected finger down completely when the doctor last saw the hand March 14, 1958. Appellee complained then that the end of the finger was tender, the finger was stiff, and appellee had to exercise care about exposing it to cold. He could not tolerate cold in that finger as in his other fingers. The circulation in the finger is impaired and this is why it gets cold. The strength of the hand was then and will be definitely affected and will be demonstrated in such efforts as attempting to climb a ladder, milking a cow, and things of that sort. The decreased strength was caused by the loss of membrane. The full extent and duration or persistence of disability could not be definitely determined. The condition might improve but only time will tell. In any event appellee will have some permanent disability. He was subjected to pain and suffering and he was caused expense for medical and hospital services and some expense in employing others to perform the work he would have done in his farming operations.

Appellee had the verdict in the trial court. In considering and deciding the sufficiency of the proof to sustain the verdict for him the evidence must be viewed most favorably towards him, controverted matters must be resolved in his favor, and he must have the benefit of any reasonable inference deducible therefrom. Werner v. Grabenstein, 165 Neb. 231, 85 N. W. 2d 297. It is because of this that only the evidence tending to support the verdict is noted in the foregoing recitation and evidence contradictory of it has been disregarded.

Appellant argues that the verdict for appellee rests

on conjecture and speculation because of absence of proof as to how the finger was injured and that there is no evidence it was bitten off by the bear. The circumstances disclosed by the evidence as recited above are sufficient to justify if not to compel a conclusion that appellee was injured by the bear. The jury found that was the fact and the proof sustains the verdict. Equally important are the allegations of the answer which amount to an admission of that fact. The answer says appellee knew the bear was in the pen because of which he went to it, found an opening in it through which he placed his finger and invited the bear to play with appellee, "and the alleged injury which the plaintiff received and which he complains of in his petition was received when he put his finger into the pen." The argument made in this respect is contradicted by the proof and the answer.

Appellant asserts that the case of appellee must fail for the reason that he was guilty of contributory negligence as a matter of law by placing himself in a position of obvious danger without taking precautions which a reasonably prudent man would have observed under the circumstances. The court submitted the issue of contributory negligence of appellee to the jury and it resolved the issue favorably to him. Appellee was invited to be where he was in a place of business open to the public. He had a right to assume it was reasonably safe and free from hazards. Perrine v. Union Stock Yards Co., 81 Neb. 790, 116 N. W. 776; Luther v. Farmers Union Cooperative Assn., 119 Neb. 676, 230 N. W. 662. Appellee had no notice, information, or knowledge of the presence of a wild, vicious animal therein. He was not charged with assuming he might have a finger bitten off by a bear while he was there. The trial court made a more favorable submission in this respect than appellant was entitled to have. The record would not have supported a finding of contributory negligence of appellee. The issue concerning it

should have been eliminated from the case by the trial court. However, the appellant cannot complain because it was submitted to the jury.

The discussion in this case is more extensive than the condition of the record requires. It extends to such question as the doctrine of absolute liability of an owner or keeper of a wild animal for injuries inflicted by it as opposed to the view that the basis of the liability of the owner or keeper of a wild animal for injuries inflicted by it is negligence in the manner or place of keeping the animal as in the instance of actions of personal injury generally. It is fortunately not necessary or proper in the status of this case to consider the conflicting authorities concerning the nature of the liability of such an owner or keeper for an injury done by a wild animal. Negligence of appellant was made the basis of the cause of action by the specifications of the petition. Appellee considered the case to be one for a tort sounding in negligence. He requested the court by a proposed instruction to advise the jury that it must find appellant guilty of negligence in one or more of the respects charged against him by appellee as a condition of any liability of appellant to appellee. The parties each asked the court to include in its charge to the jury that the law imposed upon the keeper of a wild animal the duty of exercising "a high degree of care" and to keep the animal in such a place and in such a manner as to prevent it from injuring any person; and that failure in that regard was a prerequisite of the liability of the keeper of the animal for injury caused by it. The trial court acceded to these requests and accordingly charged the jury. The parties may not complain effectively of the action of the court which they induced. A litigant is restricted in this court to the theory of the case on which it was presented to the trial court. If a trial has been had on the theory presented by the pleadings, the case will be treated in this court on that identical basis. If a certain theory on any issue is relied upon

by the parties at the trial as the proper one, it will be adhered to on an appeal whether or not it is correct. Twenty Club v. State, *ante* p. 37, 91 N. W. 2d 64; Ring v. Duey, 162 Neb. 423, 76 N. W. 2d 433; Bohmont v. Moore, 141 Neb. 91, 2 N. W. 2d 599.

The evidence reviewed above permitted the jury to find that appellant was negligent in the place and the manner in which the bear was kept, with his knowledge, consent, and participation, in one or more of the specifications of negligence pleaded in the petition of appellee. The trial court could not have properly decided the case as a matter of law as appellant requested at the trial and as he argues should be done in this court. If a litigant who had the burden of proof produced evidence sufficient to sustain a finding for him, the trial court could not disregard it and decide the case as a matter of law. Long v. Whalen, 160 Neb. 813, 71 N. W. 2d 496; Stanley v. Ebmeier, 166 Neb. 716, 90 N. W. 2d 290.

Appellant complains because the trial court did not permit the jury to determine whether or not he was the keeper of the bear at the time of the injury to appellee. The petition charged that appellant kept the bear in a pen in the barn. The proof without dispute is that the bear was in a pen of the barn from the time he was purchased, for many months thereafter, and at the time of the injury important to this case, with the knowledge, consent, and participation of appellant. The record does not speak of the owner of the bear being at the barn or doing anything concerning the bear except he sometimes fed it, how often is not shown, provided the feed for the bear, and arranged with another to feed it the major portion of the time when the owner was not there. There is silence as to any other act directly involving the bear by the owner. Appellant had fun with the bear. He got in the picture with the bear when it was taken by a representative of the daily paper in Nebraska City a short time after the

bear was purchased. Appellant took the bear from its pen into the sale ring during sales and exhibited it for the entertainment of the persons attending the sales to whom appellant expected to make sales of property. The bear was useful in the business of appellant. It was used as a promotional incident of the business. An employee of appellant showed the bear in the sale ring on one or two occasions. The bear was on and in the property of appellant and he could have compelled the removal of the bear at any time. Appellant was in control of the bear and the property and without any doubt or question harbored the bear while it was in Nebraska City for about 1 year. The ownership of the bear is not important in this case.

Manger Bros. v. Shipman, 30 Neb. 352, 46 N. W. 527, considered these facts: Manger Bros. were in business. They operated a butcher shop. A younger brother obtained a pet wolf or coyote, kept it there some months, and then went to another state. He left the coyote with his brothers. It was on occasion tied in front of the place of business and at other times in the back yard adjacent to the place of business of the brothers. Complaint was made of its presence and the brothers were asked to remove it. They disclaimed ownership and made no effort to dispose of the coyote. One of the brothers claimed that it was owned by an employee. The brothers testified they had no knowledge the wolf was kept in the back yard but the court said that was a matter for the jury. The verdict was for the plaintiff and in affirming the judgment entered thereon the court said: "That the injuries inflicted on the defendant in error were of a very serious character is shown by all the testimony, and that these were inflicted by the wolf in question, and it is clearly shown that this wolf was kept on the premises of the Manger Bros. and fed with meat from the shop. These were circumstances which it was the duty of the jury to weigh with the testimony of the Manger Bros., as showing what

was actually done by them in the premises, either personally or by their employees. The damages are not excessive and there is sufficient testimony to sustain the verdict."

Miller v. Reeves, 101 Wash. 642, 172 P. 815, declares: "A person harboring a vicious dog, knowing its vicious propensities, is liable in damages for injuries it may cause, although not its owner." It is said in the opinion in that case: "That a person harboring a vicious animal, knowing of its vicious propensities, although not its owner, is liable in damages for the injuries it may cause another, is well settled by the authorities. In the English case of McKane v. Wood, 5 C. & P. 1, it is said: 'The harboring a dog about one's premises, or allowing him to resort there, is a sufficient keeping of the dog to support this form of action.' In 3 Corpus Juris, 106, the rule is laid down in this language: 'A man may own an animal and yet not be its keeper. The word "keeper" is equivalent to "the person who harbors." Harboring means protecting, and one who treats a dog as living at his house, and undertakes to control his actions, is the owner or keeper within the meaning of the law.'"

In Hayes v. Miller, 150 Ala. 621, 43 So. 818, 124 Am. S. R. 93, 11 L. R. A. N. S. 748, the defendant Kelly was leading a wolf by means of a chain in a street of a town when it bit and wounded the plaintiff. Kelly was accompanied by the defendant Hayes who was held by the court to have been in possession of the animal. The judgment was against Hayes because Kelly died before the trial of the case. The court said: "A person in possession of a wolf in the street of a city is liable for injuries sustained by the bite of such animal whether the person in possession of same is the owner or not."

In Malloy v. Starin, 113 App. Div. 852, 99 N. Y. S. 603, it is stated: "It is claimed by the defendant, however, that he was neither the owner nor the keeper of

the bear, and that it was not in a place to which the public had access. That he was not the owner of the bear is manifest, but that it was in the custody and under the control of the defendant's servants is also clear. * * * It was in his keeping."

Vredenburg v. Behan, 33 La. Ann. 627, announces the rule on this subject by quoting from Sherman and Redfield on Negligence, pp. 227 and 228, as follows: " 'One who harbors a dangerous animal on his premises, though not his owner in any sense, is nevertheless responsible for injuries committed by it while on or near his premises, to the same extent as if he owned it.' "

In 2 Am. Jur., Animals, § 64, p. 741, it is stated: "In an action for injuries inflicted by a dog it is not essential that the defendant be the actual owner, as in law the keeper or harborer of a dog is charged with the same duty to restrain it, if he is aware of its propensity to commit injuries, that is imposed on an owner of the animal, and it is well settled that at common law one who harbors or keeps a dog with knowledge of its vicious nature is liable for the injuries caused by it." See, also, City of Tonkawa v. Danielson, 166 Okl. 241, 27 P. 2d 348; Barber v. Hochstrasser, 136 N. J. Law 76, 54 A. 2d 458; Hayes v. Smith, 62 Ohio 161, 56 N. E. 879; Annotation, Ann. Cas. 1914B 606; Annotation, 11 L. R. A. N. S. 748.

It is not necessary to prove that the owner or harborer had knowledge of the vicious nature of the wild animal causing the injury as he is conclusively presumed to have such knowledge. Hayes v. Miller, supra; Malloy v. Starin, supra; Vredenburg v. Behan, supra; Annotation, 69 A. L. R. 511.

Appellant objected to the offer of the tables of life expectancy and he argues that there was error in admitting them in evidence. There was evidence that appellee had suffered permanent injury. It does not appear that the admission of the tables was prejudicial to appellant or that the trial court abused its discre-

tion in that regard. Their admission was not erroneous. Henry v. City of Lincoln, 97 Neb. 865, 151 N. W. 933; Lyons v. Joseph, 124 Neb. 442, 246 N. W. 859; Bresley v. O'Connor, Inc., 163 Neb. 565, 80 N. W. 2d 711.

Appellee testified over objection that immediately after he was injured he said in the hearing of some men who were standing nearby: "What they got in that pen?" Someone answered: "There's a bear in there." Whereupon appellee said: "Well, he just bit my finger off." Appellant contends that the inquiry of appellee and his statement above quoted were self-serving and inadmissible. Appellant does not object to the statement of a bystander: "There's a bear in there." The statements of appellee were made under the immediate force of the circumstances and not as an afterthought. They related to facts which are otherwise established in the record beyond dispute. They were part of the res gestae. The court did not abuse its discretion in admitting the evidence. Bowers v. Kugler, 140 Neb. 684, 1 N. W. 2d 299, states: "The res gestae statement must be made under the immediate force of circumstances, and not as an afterthought." See, also, Suhr v. Lindell, 133 Neb. 856, 277 N. W. 381.

The judgment should be and it is affirmed.

AFFIRMED.