Mary Ann SENDELBACH, Plaintiff and Appellant,

v.

Edward GRAD and Elizabeth Grad, Defendants and Appellees.

Civ. No. 9212.

Supreme Court of North Dakota.

Oct. 15, 1976.

Farhart, Rasmuson, Olson & Lian, Minot, for plaintiff and appellant; argued by Steven C. Lian, Minot.

McClintock, Butz & Kraft, Rugby, for defendants and appellees; argued by Carlan J. Kraft, Rugby.

ERICKSTAD, Chief Justice.

Mary Ann Sendelbach received serious injuries to her left leg as the result of being bitten by a dog owned by Edward and Elizabeth Grad. The incident occurred at

the Grads' farm on April 30, 1973. A suit to recover damages from the Grads, based upon negligence and strict liability, resulted in a jury verdict for the Grads. This appeal is taken from an order of the McHenry County District Court denying Mrs. Sendelbach's motion for a new trial.

Mrs. Sendelbach asserts that the trial court erred in refusing to adopt her requested instructions applying a strict liability standard for injuries caused by animals and defining "vicious propensity", and also in failing to find, as a matter of law, that she was on the Grad premises as an invitee at the time of her injury.

When Mrs. Sendelbach and her husband retired from farming, they gave their chickens to Edward and Elizabeth Grad. The Grads, in return, gave the Sendelbachs free eggs for a period of time, after which the Sendelbachs occasionally purchased eggs from the Grads.

The Sendelbachs drove to the Grad farm on April 30, 1973 to purchase three dozen eggs. When they found no one at the house, they went to the barn where Mrs. Grad was milking the cows. There were two eggs short of three dozen stored in the barn. As Mrs. Grad was too busy to leave the barn, Mrs. Sendelbach offered to gather the two eggs from the chicken coop herself. It is unclear from the record whether Mrs. Grad assented to this.

In order to get to the coop, Mrs. Sendelbach had to pass through a gate near a doghouse. As she walked past the doghouse, Queenie, the Grads' dog came from behind her and bit her on the lower left leg.

There was no evidence that the dog had ever bitten another human being. Mr. Grad testified that the dog would nip at the heels of the cattle when herding them, but that it would only go after the cattle on command. The dog had given birth to a litter of pups a few days prior to the incident and all but one had been disposed of. Mr. Grad testified that the dog was "not as friendly" on the day in question and was "upset". He testified that his young grandchildren had played with the dog and pups without incident that weekend.

We shall first examine Mrs. Sendelbach's argument that she was, at the time and place of the injury, an invitee as a matter of law. The jury was instructed as to the distinction between a licensee and an invitee and, in response to a special verdict question, found that Mrs. Sendelbach was a licensee at the time of the injury.

The import of the finding that Mrs. Sendelbach was a licensee rather than an invitee at the time of the injury is with regard to the standard of care the Grads owed her. An invitee is owed a duty of reasonable care by the landowner to prevent his injury. *Johanson v. Nash Finch Co.*, 216 N.W.2d 271 (N.D.1974); *Huus v. Ringo*, 76 N.D. 763, 39 N.W.2d 505 (1949).

In general, the only duty a possessor of land owes a licensee is to refrain from willfully and wantonly injuring him. *Werth v. Ashley Realty Co.*, 199 N.W.2d 899 (N.D.1972); *Costello v. Farmers' Bank of Golden Valley*, 34 N.D. 131, 157 N.W. 982 (1916). We recognize exceptions to this general rule, to be applied when necessary. *Werth v. Ashley Realty Co., supra.*

The determination of whether one is a licensee or invitee on the premises of another necessitates defining those terms with reference to the policies of the distinction.

It has been stated that the higher standard of care imposed on a landowner regarding an invitee is the price paid for the economic benefit obtained. *Restatement of Torts*, §§ 332, 343, Comment a ; see W. Prosser, *Torts*, p. 386 (4th Ed. 1971). Under the so-called "economic benefit" test, resulting from this reasoning, a visitor acquires the status of invitee when his presence relates to business of at least potential pecuniary profit to the possessor. *E.g., Schwerdtfeger v. State*, 148 Cal.App.2d 335, 306 P.2d 960 (1957); *McNulty v. Hurley*, 97 So.2d 185 (Fla.1957).

The other prevalent theory justifying the distinction is commonly referred to as the "invitation theory". Under this view, an express or implied invitation by the occupi-

er of the land creates the invitee status. The invitation must be such that it represents that the invitor has exercised reasonable care in making the premises safe for the invitee. *E.g., Hanson v. Town and Country Shopping Center, Inc.*, 259 Iowa 542, 144 N.W.2d 870 (1966); *Dowd v. Portsmouth Hospital*, 105 N.H. 53, 193 A.2d 788, 95 A.L.R.2d 986 (1963).

Many cases, rather than flatly rejecting the economic benefit test, adopt both tests to be used alternatively. *E.g., Preston v. Sleziak*, 383 Mich. 442, 175 N.W.2d 759 (1970); *Dowd v. Portsmouth Hospital, supra*.

The *Restatement (Second) of Torts*, § 332 (1965) defines two classes of invitees:

"(1) An invitee is either a public invitee or a business visitor.

"(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

"(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land."

The district court's instructions defining invitee spoke only of a business visitor, making no reference to the term public invitee. The appellant's reply brief of Mrs. Sendelbach argues that comments regarding business visitors are "more applicable to the instant case." Thus we will limit our treatment of invitees to that category.

The real crux of the distinction between licensees and invitees is as stated in Comment *a* to the *Restatement (Second) of Torts*, § 332, *supra*:

"Invitees are limited to those persons who enter or remain on land upon an invitation which carries with it an implied representation, assurance, or understanding that reasonable care has been used to prepare the premises, and make them safe for their reception. . . ."

In this case there was testimony that eggs were sold to anyone who called; that the eggs were never advertised for sale;

that the eggs were produced primarily for use by the Grad family; that there were extra eggs once or twice a week; that the Sendelbachs previously would call ahead before coming for eggs—but did not do so on the day of the injury; that the Sendelbachs usually visited socially when they came for eggs; that this was the first time Mrs. Sendelbach went to the barn for eggs. Mrs. Sendelbach testified that the reason she purchased the eggs was because they were fresh, not because of the price. It is unclear from the evidence whether Mrs. Grad assented to Mrs. Sendelbach's going to the chicken coop.

This evidence is inconclusive as to whether the circumstances of Mrs. Sendelbach's presence on the Grad farm, and particularly at the specific place of her injury, were such as to imply a representation of reasonable care by the Grads in making the premises safe for her. Nor is the evidence conclusive as to whether the sale of eggs was in expectation of a pecuniary profit or was merely a service to a friend who wanted farm fresh eggs. We cannot say that reasonable men could draw but one conclusion from the facts presented. Thus, the trial court was correct in refusing to rule that Mrs. Sendelbach was, at the time of her injury, an invitee as a matter of law. *See e.g., Kresel v. Giese*, 231 N.W.2d 780 (N.D.1975); *Gleson v. Thompson*, 154 N.W.2d 780 (N.D.1967); *Degenstein v. Ehrman*, 145 N.W.2d 493 (N.D.1966).

It was stated in Mrs. Sendelbach's brief that "the plaintiff has no quarrel with the definition" of invitee as given in the jury instructions, her argument being only that the court should have applied that definition to find her an invitee as a matter of law. Therefore, we need not rule on the correctness of the definition.

Mrs. Sendelbach also maintains that the trial court erred in its instruction as to the common law doctrine regarding dog bites. Her proposed jury instruction on that point, which was rejected by the trial court, reads (in part) as follows:

"One who keeps or owns an animal which he or she knows or should know is

vicious or dangerous to people is liable to any person injured by the animal irregardless (sic) of any negligence by the defendants."

The instruction given by the court adopted the language of the appellant's proposed instruction, but added a due care standard to be applied if viciousness and the owner's knowledge thereof is found:

"An owner is not liable for personal injuries inflicted by his dog unless the owner knew or reasonably should have known that the dog was dangerous or vicious. One who owns a dog is bound to take notice of any vicious or dangerous propensity or trait of the dog itself, or of the class to which it belongs, which was known to the owner or which reasonably should have been known to him. If the dog's traits or propensities are of a nature likely to cause injury, the owner must exercise reasonable care to guard against and to prevent injuries or damages which are reasonably to be anticipated from the dangerous or vicious propensity of the dog.

"The plaintiff in this case has the burden of proving that an owner of the dog involved knew that the dog was dangerous or vicious, or reasonably should have known this, and if so, that the owner did not exercise ordinary care to guard against and to prevent injury or damage reasonably to be expected from such animal. . . ."

The question of what an owner's liability is for damage done by an animal is one of first impression in North Dakota. Jurisdictions which have ruled on this matter often distinguish between species which are deemed dangerous by their very nature and those considered normally harmless. *See e. g., Wenndt v. Latare*, 200 N.W.2d 862 (Iowa 1972); *Warwick v. Mulvey*, 80 S.D. 511, 127 N.W.2d 433 (1964); *Crunk v. Glover*, 167 Neb. 816, 95 N.W.2d 135 (1959). As it is here undisputed that a domestic dog belongs to the latter class, our findings will be so limited. We will likewise be limited to a discussion of injuries by animals on their owners' property, that being the circumstance in this case.

Treatises dealing with the subject speak of the English Common Law regarding injuries caused by domestic animals as imposing strict liability on the owner where the animal has vicious tendencies and the owner knows or should know of such tendencies. *See* W. Prosser, *Torts*, pp. 499–503 (4th Ed.1971); Harper & James, *The Law of Torts*, Vol. 2, pp. 836–837 (1956). There is a trend, however, rejecting this strict liability standard. *E.g., Hansen v. Brogan*, 145 Mont. 224, 400 P.2d 265 (1965); *King v. Blue Mountain Forest Association*, 100 N.H. 212, 123 A.2d 151 (1956). *See* 4 Am.Jur.2d, *Animals*, § 81, pp. 328–329; Harper and James, *supra*, pp. 838–839.

As we have not previously ruled on this question and since the case law in other jurisdictions is in flux, it is necessary that we enunciate a standard of liability which fits the quality of life and the expectancies of the people of North Dakota.

It is argued in appellant's brief that a strict liability standard is very important to the rights of the victim, and that the owner of an animal could "easily dispose of the risk" (presumably by disposing of the animal). This argument fails to take into consideration the utility of the animal and precludes a commonsense balancing of all interests concerned.

The facts of this particular case indicate that the Grads' dog was kept on the farm to herd cattle. Indeed, a major facet of the plaintiff's argument that the dog was vicious hinged on the fact that she would nip at the heels of the cattle while herding them.

The value of a domestic animal, whether put in economic terms or viewed more intangibly, as with regard to a pet, is generally not such that its owner should dispose of it upon notice of an incident which a jury could conceivably find indicative of a "vicious propensity".

This language from a 1939 law review article on the subject is perhaps more succinct:

"Indeed, if the ownership and exhibition of wild animals and the harboring of vicious dogs to protect property are recognized as lawful, it would be anomalous to declare that because of the very act of keeping them, one is liable under all circumstances to persons injured by them. . . ." McNeely, *A Footnote On Dangerous Animals*, 37 Mich.L.Rev. 1181, 1192 (1939).

■ We find that the standard of liability for injuries caused by an animal to a person on the premises of the possessor of the animal is no different than the standard regarding injuries to a visitor caused by other means.

■ Having declined to adopt a strict liability standard for this situation, we still must determine whether there was error in giving a jury instruction requiring both knowledge of a vicious propensity *and* a reasonable care standard.

Recently we found the traditional invitee-licensee standards to be workable when appropriate exceptions are carved out of the general rules. *Werth v. Ashley Realty Co., supra.* In *Werth*, at 199 N.W.2d 905, we made reference to the "hidden peril" exception to the licensee standard, citing the following encyclopedia language:

"In accordance with the general rule discussed supra § 63(32), an owner or person in charge of premises ordinarily is not under any affirmative duty to give licensees warning of concealed perils, although he might, by the exercise of reasonable care, have discovered the defect or danger which caused the injury. However, he owes a duty not knowingly or willfully to let the licensee run into, or expose him to, a hidden danger or peril, but should take whatever steps are reasonable, under the circumstances, to protect the licensee from such peril, and accordingly should give to the licensee a reasonable warning, or information regarding the dangerous condition, which is not open to the licensee's observation but of which the owner or occupant knows or should know. In case of failure of this duty, the owner or proprietor may be held liable for unusual concealed perils against which the licensee cannot protect himself, and this liability is predicated, not on the existence of the concealed danger, but on the failure to give warning of its existence." 65 C.J.S. Negligence § 63(39), pp. 713–714.

The court's instruction as to liability for a dog bite appears to us to be a specialized definition of the "hidden peril" or "concealed danger" exception to the licensee standard as set out above. The possessor of land, once he has notice of a "hidden peril", owes a duty not to knowingly expose a licensee to the peril. The district court here instructed the jury that when the owner knew or should have known of the dangerous propensity of an animal, he must exercise reasonable care to protect the guest from injury. The instruction given denotes, if anything, a *higher* duty of care than adopted in *Werth*. Thus any error would be in the appellant's favor.

We do not say that the instruction and special verdict question are necessarily correct statements of the law in all situations. However, in this particular case the language used was not inappropriate.

■ Mrs. Sendelbach also ascribes error to the district court's refusal to give her requested instruction defining "vicious propensity":

" 'Vicious propensity' is a tendency of an animal to do any act which might endanger the safety of persons and property of others in a given situation, whether it be in play or in anger, or in some outbreak of untamed nature."

We again quote a portion of the district court's instruction as to liability for dog bites in order to contrast it with the appellant's requested instruction:

"If the dog's traits or propensities are *of a nature likely to cause injury* the owner must exercise reasonable care to guard against and to prevent injuries or damages which are reasonably to be anticipated from the dangerous or vicious propensity of the dog." (Italics ours.)

We find the italicized language to be essentially the same as the requested instruction, with the possible exception of the latter's reference to an "outbreak of untamed nature." That language is unnecessary in light of the concise, clear instruction given. Therefore, there was no error in refusing to give the requested instruction.

For the reasons stated herein, the order appealed from is affirmed.

SAND, PAULSON and PEDERSON, JJ., concur.

VOGEL, Justice (concurring specially).

I concur, but with one reservation.

The majority opinion relies principally on *Werth v. Ashley Realty Co.*, 199 N.W.2d 899 (N.D.1972), in continuing the distinction between "invitees" and "licensees."

I am concerned that this renewed recognition of the rule stated in *Werth* might have the effect of perpetuating a doctrine which has long outlived its usefulness and should be abolished. As *Werth* recognizes, even in 1972 some jurisdictions had abolished the distinction between invitees and licensees and substituted a rule that reasonableness of the conduct of owners and possessors of land under all the circumstances provided the proper test for determining liability. The *Werth* opinion recognized that the rule distinguishing between invitees and licensees was then under attack, and *Werth* merely held that the rule would be adhered to in North Dakota for the present and would be reexamined later. See Syllabus ¶ 3.

In 1975, we again forecast a reexamination of the common-law distinction. In *Francis v. Pic*, 226 N.W.2d 654, 659 (N.D. 1975), we said:

"The passage of time has not presented an opportunity to re-examine the common law conception nor have cases been presented which would be suitable for such re-examination. We do not at this time find it appropriate or necessary to further re-examine the common law definitions and rules of law as they may apply to licensees, invitees and trespassers."

I think it is now time for *Werth* to self-destruct.

Since *Werth* was decided, and immediately prior to the *Werth* decision,[1] about fifteen jurisdictions have abrogated the distinction between invitees and licensees either wholly or to a large extent. Nine have continued the distinction, and twenty have not acted. Two have elevated the status of social guests into a separate category, and three continue to call them "licensees" but limit the harshness of the former distinction. In other words, about two-thirds of the jurisdictions which have reconsidered the distinction between licensees and invitees have abandoned the distinction and have adopted the modern rule.

I think it is high time for North Dakota to consider doing the same.

I concur in the result in this case because the question of abandonment of the distinction was not briefed or argued. I add this concurrence to make clear that my concurrence in this case is not based on any reliance on *Werth v. Ashley Realty Co.* except insofar as that decision states a rule temporarily in effect but likely to disappear at any time.

SAND and PEDERSON, JJ., concur in Justice VOGEL's special concurrence.

---

1. Minnesota abrogated the distinction thirteen days before *Werth* was released, and its decision appears in the same North Western Reporter volume as *Werth. Peterson v. Balach*, 294 Minn. 161, 199 N.W.2d 639 (1972).