Sullivan
No. 7305
No. 7463
No. 7576

BLUE MOUNTAIN FOREST ASSOCIATION

v.

TOWN OF CROYDON AND TOWN OF PLAINFIELD
BLUE MOUNTAIN FOREST ASSOCIATION

v.

TOWN OF CROYDON, TOWN OF CORNISH, TOWN OF PLAINFIELD
BLUE MOUNTAIN FOREST ASSOCIATION

v.

TOWN OF CORNISH AND TOWN OF PLAINFIELD

May 6, 1977

366

*McLane, Graf, Greene, Raulerson & Middleton,* of Manchester (*Mr. Stephen J. Selden* by brief and *Mr. Jack B. Middleton* orally), for the plaintiff.

*Hall, Morse, Gallagher & Anderson,* of Concord (*Mr. G. Wells Anderson* and *Mr. Charles T. Gallagher* orally), for the defendant town of Plainfield.

*Gardner & Clauson,* of Hanover (*Mr. K. William Clauson* orally), for the defendant town of Croydon.

*Buckley & Zopf,* of Claremont *(Mr. Robert B. Buckley, Jr.* orally), for the defendant town of Cornish.

BOIS, J. We have before us appeals involving applications by the Blue Mountain Forest Association (the "taxpayer") for current use taxation for the years 1974 and 1975 for its property in the towns of Cornish, Plainfield and Croydon. The issue common to all the appeals is whether the taxpayer's property qualifies for current use taxation as "forest land." The separate appeals also present various procedural issues as to the proper manner of prosecuting an appeal from a decision of the board of taxation (the "board"). Our first task is to attempt to bring order to the procedures out of which these appeals arise.

### 1. *Procedure*

*Applications to town of Plainfield.* On April 10, 1974, the taxpayer applied to the town assessing officials for 1974 assessment of all its land in the town as forest land. Current use taxation was denied, and on August 8, 1974, review was sought before the board. A hearing was conducted, and on October 3, 1974, current use assessment was denied on the grounds that the taxpayer's "practice of silviculture is not primarily used for forest crops." Appeal was taken to the superior court on October 30, 1974.

On April 7, 1975, the taxpayer applied to the town assessing officials for 1975 assessment of all its land as forest land. On July 7, 1975, current use taxation was denied, and on July 28, 1975, review was sought before the board. The board dismissed the appeal on the ground that the 1974 appeal, then still pending before the superior court, presented common questions of law and fact. An appeal from this decision was filed with the supreme court. Additionally, on August 6, 1975, the taxpayer filed a motion in the superior court praying that its 1974 pending petition "be amended to include an appeal from a denial of the . . . current use assessment application . . . for the tax year beginning April 1, 1975."

The town moved to dismiss the 1974 appeal, contending that the sole remedy upon dismissal by the board was an appeal to the supreme court. October 8, 1975, after hearing, the superior court (recommendation by *Amos N. Blandin, Jr.,* Judicial Referee, approved by *Johnson,* J.) transferred without ruling the petition,

the motion by the taxpayer to amend, and the motion by the town to dismiss.

After this action by the superior court, the board reversed its earlier decision on the 1975 application and decided to hear the matter on the merits. A hearing was conducted and on March 2, 1976, current use taxation was denied. An appeal from that decision has been taken to the supreme court.

*Applications to town of Cornish.* On April 10, 1974, the taxpayer applied to the town assessing officials for 1974 assessment of all its land in the town as forest land. Current use taxation was denied, and on August 8, 1974, review was sought before the board. A hearing was conducted, and on October 3, 1974, current use assessment was denied on the grounds that the taxpayer's "practice of silviculture is not primarily used for forest crops." Appeal was taken to the superior court on October 30, 1974.

On April 7, 1975, the taxpayer applied to the town assessing officials for 1975 assessment of all its land as forest land. Current use taxation was denied, and on May 28, 1975, review was sought before the board. The board dismissed the appeal on the ground that the taxpayer's 1974 appeal, then still pending before the superior court, presented common questions of law and fact. Apparently no appeal from this decision was filed with the supreme court. On August 6, 1975, the taxpayer filed a motion in the superior court praying that its 1974 petition "be amended to include an appeal from a denial of the petitioner's current use assessment application . . . for the tax year beginning April 1, 1975."

The town moved to dismiss the 1974 appeal, contending that the taxpayer's sole remedy upon dismissal by the board was an appeal to the supreme court. The court granted the motion. The 1975 appeal to the superior court was not taken until more than thirty days after the board's decision, and the court denied taxpayer's motion to amend its 1974 appeal to include the 1975 appeal. Taxpayer's exceptions to these adverse rulings were reserved and transferred.

After this action by the superior court, the board reversed its earlier decision on the 1975 application and decided to hear the matter on the merits. A hearing was conducted and on March 2, 1976, current use taxation was denied. An appeal from that decision has been taken to the supreme court.

*Applications to town of Croydon.* The Croydon applications are unique in that no attempt was made by the taxpayer to appeal from the board's denial to the superior court.

In 1974, taxpayer made timely application to the Croydon assessors for current use taxation. No notice per se of the denial of the application was ever given to the taxpayer. However, when the 1974 tax bill was received on November 30, 1974, it did not reflect current use assessment. In July 1975, taxpayer filed an appeal with the board contesting the denial of 1974 current use assessment. The board initially dismissed the appeal on the ground that it presented questions of law and fact common to the 1974 Plainfield and Cornish appeals then pending in the superior court. An appeal from this ruling was filed with the supreme court. After the superior court's disposition of the Plainfield and Cornish appeals, the board reinstated the 1974 Croydon appeal. After hearing, the board concluded the appeal should be dismissed as untimely, notwithstanding that the town had waived any claims it might have had in this regard. The board reasoned that "timeliness" could not be stipulated by the parties. This holding is also before the supreme court for review.

Taxpayer's 1975 application to the town assessing officials was denied, and appeal made to the board. As with the 1975 applications to Plainfield and Cornish, the board initially dismissed the appeal on the ground that it presented questions of law and fact common to the 1974 Plainfield and Cornish appeals then pending in superior court. An appeal from this decision was filed with the supreme court. After the superior court's disposition of the pending Plainfield and Cornish appeals, the board reinstated the 1975 Croydon appeal. After hearing, relief on the merits was denied by the board, and the taxpayer has appealed this denial to the supreme court.

II. *Procedural Issues*

On these facts, we are presented with the following procedural issues:

A. May the taxpayer appeal from the board of taxation to the superior court? (This issue affects the 1974 Plainfield and Cornish applications);

B. Was the board empowered to "reinstate" the applications which it had previously dismissed? (This issue affects the

1974 Croydon application and the 1975 Plainfield, Cornish and Croydon applications);

C. Was the 1974 appeal to the board from the "decision" of the Croydon selectmen untimely?

1. *Proper route of appeal from the board of taxation*

RSA 79-A:9 (VI) (Supp. 1975), entitled "Appeal," provides as follows:

> Either party aggrieved by the decision of the board of taxation may, within thirty days after notice in writing of the decision of the board of taxation, file notice of appeal to the supreme court specifying all the grounds upon which such party bases his objections. For the purposes of such appeal, the findings of fact by said board shall be final and any such appeal shall be limited to questions of law. An election by an applicant to appeal in accordance with this paragraph shall be deemed a waiver of any right to petition the superior court in accordance with RSA 79-A:11.

RSA 79-A:11 (Supp. 1975), entitled "Appeal to Superior Court", provides in relevant part:

> If the assessing officials deny . . . any application . . ., the applicant, having complied with the requirements of RSA 79-A:5, II may, within six months after notice of denial . . ., apply by petition to the superior court of the county, which shall make such order thereon as justice requires. Any appeal to the superior court under this section shall be in lieu of an appeal to the board of taxation pursuant to RSA 79-A:9.

It is undisputed that, at the least, these provisions accomplish the following:

(1) provide for an appeal from the board of taxation, as ultimate finder of fact, to the supreme court; and

(2) provide in lieu of a fact-finding proceeding before the board of taxation for a fact-finding proceeding in the superior court.

The taxpayer argues that the provisions of RSA 79-A:9 (VI) (Supp. 1975) do not explicitly prohibit, and therefore must be said to allow, an appeal from the board to the superior court, if in

fact no appeal is taken to the supreme court. The argument is made that the section provides the applicant with a choice of proceeding either directly from the board to the supreme court or from the board to the superior court. To arrive at this conclusion reliance is placed on the last sentence of RSA 79-A:9 (VI) (Supp. 1975) which provides "[a]n election by an applicant to appeal in accordance with this paragraph shall be deemed a waiver of any right to petition the superior court in accordance with RSA 79-A:11." Arguing that the phrase an "appeal in accordance with this paragraph" refers to an appeal to the supreme court, the taxpayer reasons that it has an "election of remedies":

(1) "in accordance with this paragraph" to the supreme court at which time the right to appeal from the board to the superior court is lost or;

(2) since it is not explicitly prohibited by RSA 79-A:9 (VI) (Supp. 1975), an appeal from the board to the superior court.

■ If the taxpayer is correct in his statutory interpretation, we would be forced to conclude that the last sentence of RSA 79-A:9 (VI) (Supp. 1975) is mere surplusage, since it can hardly be supposed that under any circumstances appeal would lie from the board to the supreme court and then to the superior court. We are inclined to believe that the legislature did not so waste its words. See 2A Sutherland, Statutes and Statutory Construction § 46.06 (4th ed. 1973).

■ The evident purpose of the legislation is clear: to provide for an original fact-finding procedure in either the board of taxation or the superior court, with the appeal of questions of law running to the supreme court. Under taxpayer's theory, the appeal to the superior court would inevitably be duplicative—either of the fact-finding role of the board or, if confined to questions of law, of the review function of this court. The statute does not explicitly authorize such a role for the superior court, and we cannot presume that such duplication was intended.

■ However, our primary reason for rejecting taxpayer's argument is found in the same last sentence of the statutory provision on which the taxpayer relies. The "right to petition the superior court in accordance with RSA 79-A:11" is the right to an

original fact-finding hearing before the superior court, and it is this right which an applicant may elect to waive. Accordingly, the "election" to which RSA 79-A:9 (VI) (Supp. 1975) refers must be the election as to which body (the board or the superior court) will be the trier of fact—not as taxpayer contends, the "election" to appeal to the supreme court. *See* 18 N.H.B.J. 105, 109 (1976).

 We conclude that the superior court lacked jurisdiction to hear the 1974 Plainfield and Cornish applications. Since the time for taking an appeal from the board to the supreme court has long since expired, the adverse decision of the board on these two applications must be considered final.

2. *Reinstatement of 1975 applications*

The town of Cornish argues that the board lacked authority to reinstate the taxpayer's 1975 application to that town, since the reinstatement took place after the statutory time allotted for taking an appeal from the original order of dismissal. The town argues that once this period has elapsed, the board's decision is final.

 We note that there is no real problem with respect to the 1974 application to Croydon and the 1975 applications to Plainfield and Croydon, all of which were also "reinstated", since the taxpayer appealed to this court from the original board decision dismissing these applications. As to these applications, the taxpayer has clearly preserved all its appellate rights. The board has now heard these applications on their merits, and the interests of judicial economy require that we review the merits at this juncture. *See Hanover v. City of Lebanon,* 116 N.H. 264, 357 A.2d 115 (1976).

With respect to the 1975 application to Cornish, no appeal was taken from the original board decision dismissing the matter. Thus, our only means of review in connection with this application is the appeal from the board's denial of current use assessment following its reinstatement of the action.

The board's order dismissing taxpayer's 1975 Cornish application reads as follows:

> The appeal is dismissed.
> Now pending in Superior Court is Taxpayer's appeal from the denial of current use assessment for the tax year beginning April 1, 1974. Taxpayer can amend the petition

to include the denial of current use assessment for the year beginning April 1, 1975. The two appeals involve the same property in the same town and appear to have common questions of law and fact. Also, consolidation in Superior Court precludes a situation of contrary rulings on apparently the same issue.

■ The board did not purport to decide the matter before it, but rather chose to transfer the case to the superior court. The taxpayer was entitled to have the matter heard by the board, RSA 79-A:9 (Supp. 1975), and thus the board's dismissal was not supported in law. In these circumstances, we view the improvident dismissal as an interim procedural order which did not serve to adjudicate the merits of the taxpayer's petition. The taxpayer will not be prejudiced by his failure to appeal this interim order. RSA 79-A:9 (VI) (Supp. 1975). Accordingly, we will consider the merits of the petition on this post-reinstatement appeal.

3. *Timeliness of the 1974 Croydon appeal*

The board refused to consider taxpayer's 1974 Croydon application noting that the appeal, filed in 1975, came more than thirty days after the town's rendering of the 1974 tax bill (which did not reflect current use taxation). It reasoned that the taxpayer must then have known that its application had been denied.

RSA 79-A:9 (I) (Supp. 1975) provides that the taxpayer "may, on or before thirty days after any such action [denying an application] by the assessing officials . . . apply to such board [of taxation] for a review. . . ." RSA 79-A:5 (III) (Supp. 1975) requires that the "assessing officials . . . notify the applicant on a form provided by the commissioner no later than July first, or within fifteen days if the application is filed after July first, of their decision to classify or refusal to classify his parcel of land by delivery of such notification to him in person or by mailing such notification to his last and usual place of abode."

■ In the absence of such formal notification here, the board found an adequate substitute in the town's mailing to the taxpayer a 1974 tax bill which did not reflect current use assessment. We find this reasoning unpersuasive. The taxpayer could reasonably have believed that the tax bill represented administrative inertia rather than a decision on its application. Notwithstanding the tax bill, the taxpayer could have reasonably believed that its

application was still "in progress." We conclude that the board erred in its ruling that the 1974 Croydon application was untimely.

To summarize: We properly have before us appeals from the following current use applications: The Croydon application for the 1974 tax year and the 1975 tax year applications for Plainfield, Cornish and Croydon. Although these appeals do not all possess the same procedural "maturity," the substantive issues of fact and law raised in each are virtually identical. Accordingly, the following discussion on the "merits" is dispositive of each appeal.

III. *Merits.*

The taxpayer, a voluntary corporation with twenty-seven shareholding members, owns a 19,000-acre tract in southern New Hampshire. The tract occupies portions of the towns of Croydon, Cornish, Plainfield, Grantham and Newport. The purpose of the association, according to its bylaws, is ". . . to provide recreational facilities for its members; and incidentally thereto, the cultivation, improvement, and conservation of forest lands and timber. . . ." In pursuit of its recreational purposes, the association maintains the tract as an exclusive hunting and fishing preserve for its members. It is undisputed that maintenance of the tract for the wild game stocked thereon is the association's principal objective; as stated in the bylaws:

> Sale or cutting of timber shall be restricted to trees which are overmature, undesirable, or salvage, and for forest improvement only, and shall never be conducted where such cutting or removal would in any way damage or impair cover, or food and sustenance for animals, game, or fish.

The association claims that its land is entitled to current use taxation as "forest land," defined by statute as "any land receiving silvicultural treatment as determined and classified by criteria developed by the state forester and adopted by the [Current Use Advisory] board." RSA 79-A:2 (V) (Supp. 1975). In turn, the regulations of the current use advisory board provide, in relevant part, that "[t]he tract of land shall be primarily used for the growing and harvesting of repeated forest crops, including timber products, maple sap, and Christmas trees."

The selectmen of the towns involved in these appeals determined that the association's land was not forest land because it was pri-

marily used as a game preserve and not primarily for the growing and harvesting of repeated forest crops. The board affirmed, noting that "[t]axpayer's activities on the land clearly show that hunting and fishing is intended to take precedence over forestry."

Before reviewing in detail the evidence respecting the association's use of its land, it is helpful to take an overview of the "Current Use Taxation" statute. RSA 79-A:1 *et seq.* (Supp. 1975). The declaration of public interest, RSA 79-A:1 (Supp. 1975), makes clear that the statute is primarily intended as a conservation measure to preserve the state's inheritance of land, water, forest, and wildlife resources:

> It is hereby declared to be in the public interest to encourage the preservation of open space in the state by providing a healthful and attractive outdoor environment for work and recreation of the state's citizens, by maintaining the character of the state's landscape, and by conserving the land, water, forest, and wildlife resources. It is further declared to be in the public interest to prevent the conversion of open space to more intensive use by the pressure of property taxation at values incompatible with open space usage, with a minimum disturbance of the concept of ad valorem taxation.

The statute goes on to enumerate several types of "open space land" which qualify for current use taxation: namely, farmland, flood plain, forest land, recreation land, wetland and wild land. RSA 79-A:2 (Supp. 1975). The statutory definitions of these terms are to be supplemented by criteria adopted by the current use advisory board, an administrative body of eleven members functioning within the department of revenue administration. Additionally, the board is charged with the responsibility of meeting annually "to review the open space land use criteria previously established, to establish such new criteria and values as legislation and land management practice may indicate, [and] to establish a schedule of criteria and values to be recommended for the current tax year. . . ." RSA 79-A:4 (Supp. 1975). The selectmen or assessing officials are in turn instructed to base their appraisals on "current use values established by the board." RSA 79-A:5 (I) (Supp. 1975).

The New Hampshire statute is just one example of legislative action in numerous states designed to preserve "open spaces" through the mechanism of current use taxation. *See e.g.*, Conn. Gen. Stat. Ann. §§ 12-107a to 111 (1972); Pa. Stat. Ann. tit. 16 §§ 11941-47 (Supp. 1975); R.I. Gen. Laws Ann. §§ 44-27-1 to 27-6 (1971). These statutes seek to remedy the "extraordinarily adverse impact on the . . . maintenance of land as open space" resulting from a property tax geared to market value. Note, *Tax Planning for Land Use Control*, 5 Urban Lawyer 639, 652 (1973). Favorable tax treatment is justified by the fact that open land does not receive as many benefits and does not make as many demands on the public treasury as developed land. *See* Note, *Property Taxation of Agricultural and Open Space Land*, 8 Harv. J. Legis. 158 (1970); Hagman, *Open Space Planning and Property Taxation—Some Suggestions*, 1964 Wis. L. Rev. 628.

■ The New Hampshire statute defines "forest land" as "any land *receiving* silvicultural treatment as determined and classified by criteria developed by the *state forester* and adopted by the board." RSA 79-A:2 (V) (emphasis added). We think it evident from this definition that the statute looks to the treatment received by the land, irrespective of the human purposes underlying that treatment. The criteria for silvicultural treatment are to be developed by the state forester; this is further recognition in the statute that forest land depends for its classification on criteria operationally related to whether the land is receiving treatment dealing "with the establishment, development, reproduction, and care of forest trees" (definition of "silviculture" in *Webster's Third New International Dictionary* (1961)). *Cf.* Conn. Gen. Stat. Ann. § 12-107b(b) (Supp. 1976); Pa. Stat. Ann. tit. 16 § 11941 (2) (Supp. 1975); R.I. Gen. Laws Ann. § 44-27-2(b) (1971).

■ The current use advisory board, pursuant to its statutory duty to adopt criteria by which to determine whether land is receiving silvicultural treatment, adopted regulations requiring, *inter alia*, that the "land shall be primarily used for the growing and harvesting of repeated forest crops." This regulation must not do more than "fill in the details to effectuate the purpose of the statute." *Reno v. Hopkinton*, 115 N.H. 706, 707, 349 A.2d 585, 586 (1975).

Silvicultural treatment constitutes a certain body of accepted forestry practices. The extent to which a tract of land receives such treatment may, of course, vary. The treatment may be substantial, indicating the active application of forestry principles, or it may be insubstantial, indicating haphazard forestry. A requirement of primary use may be said to reflect this continuum, by excluding from the definition of forest land those tracts receiving only insubstantial forest management. So construed, we have no hesitancy in saying that the regulation effectuates the statutory purpose. However, the regulation would be offensive to the statute if "primary use" were in any way construed as looking to the human purposes behind the treatment given the land; for, as noted previously, the statute requires that the criteria defining forest land relate operationally to the treatment which the land receives.

 Against this background we consider the evidence regarding the treatment which the taxpayer's land receives. It is undisputed, and the board properly found, that the taxpayer's land is used for the growing and harvesting of forest crops, that the land supports a reasonable stand of commercial forest trees, and that the taxpayer follows generally accepted forest improvement and harvest practices and complies with state and local forest laws, rules and regulations. Further, the taxpayer employs a forester, and generates annual income from the selective cutting of timber. Because the taxpayer's foremost purpose is the maintenance of the area as a game preserve for the recreational use of its members, there are certain aspects in which the treatment of the land "deviates" from that which the land would receive were forestry the sole purpose. These deviations fall into three principal areas: The maintenance of certain tree species of low commercial timber value for their value as food for the game; "browsing" of the trees in the forest caused by the stocked game; the maintenance of feeding stations for the animals.

On this evidence, the board reasoned that the "taxpayer's bylaws and the taxpayer's activities on the land clearly show that hunting and fishing is intended to take precedence over forestry," and that the primary "use" of the land was thus not forestry. This reasoning was faulty inasmuch as it focused on the purposes of the taxpayer, rather than the treatment received by the land. Although it is indisputable that the foremost purpose of the taxpayer is the providing of hunting and fishing recreation to its members, this

fact is relevant only insofar as it leads to treatment of the land inconsistent with silvicultural treatment.

While, as noted previously, the demands of game management do lead to certain practices inconsistent with forestry management, we are constrained to hold that these practices have, at most, a minimal impact on the silvicultural treatment which the land otherwise receives. The taxpayer specially maintains beech, oak and apple trees for the benefit of the game—tree species which would not otherwise receive special treatment. However, the beech trees comprise only five percent of the forest, and the apple and the oak trees each less than one percent. The animals (including wild boar, deer and elk) stocked within the tract damage the timber through "browsing"; *i.e.,* the eating of bark. However, browsing is a natural phenomenon, and would occur in any natural area where game are present. Moreover, while the browsing activity on the (taxpayer's) land is apparently somewhat heightened, it has not prevented the land from supporting a reasonable stand of commercial forest trees, and undisputed expert opinion indicated that the relative quality of the timber operations is "very good." Finally, the taxpayer maintains seventeen "feeding stations" for the animals, and in the immediate vicinity of these stations there is above average damage from browsing. However, the feeding stations together comprise only about eighty-five acres, less than one percent of the total acreage.

The conclusion is inescapable that the recreational purposes of the taxpayer have only a minimal impact on the silvicultural treatment which the land otherwise receives. Accordingly, it was error for the board of taxation to conclude that the primary use of the land was not the growing and harvesting of repeated forest crops.

■ The defendant towns seem to put considerable reliance on the fact that the taxpayer's recreational objectives lead to a less than commercially optimal forestry program. We observe that there is no statutory requirement that there be optimal commercial use of the land. The "declaration of public interest" in the statute speaks of "maintaining the character of the state's landscape, and conserving the land, water, forest, and wildlife resources." In many instances, less than optimal commercial use of forest land might better serve these purposes than optimal commercial use. Here there can be no doubt that the taxpayer has, in its 19,000 acres,

maintained the character of the landscape and conserved natural resources.

We conclude that the land in question is entitled to current use taxation as "forest land" for the 1974 tax year for Croydon and the 1975 tax year for Plainfield, Cornish and Croydon.

*Plaintiff's exceptions sustained in part.*

KENISON, C.J., and LAMPRON, J., dissented; the others concurred.

KENISON, C.J., dissenting: The current use taxation statute, RSA ch. 79-A (Supp. 1975), as construed and applied in these cases reaches a result never intended by the legislature. It violates the declaration of public interest mandated by RSA 79-A:1 (Supp. 1975) which provides that there shall be ". . . a minimum disturbance of the concept of ad valorem taxation." I find it difficult to say there is only a minimum disturbance to the tax base of the towns of Croydon, Plainfield and Cornish. Furthermore the findings and conclusions of the board of taxation that the plaintiff's use of its property ". . . clearly show[s] that hunting and fishing is intended to take precedence over forestry" are entitled to more weight than they received in considering the primary use of the property as a private hunting and fishing preserve. RSA 79-A:9 VI (Supp. 1975). *See King v. Blue Mountain Forest Ass'n,* 100 N.H. 212, 123 A.2d 151 (1956) ; Laws 1895 ch. 258 as amended; RSA 207:45.

LAMPRON, J., concurs in this opinion.