Rockingham
No. 84-532

## The State of New Hampshire

v.

## Richard Stiles

May 9, 1986

*Stephen E. Merrill,* attorney general (*Tina Schneider,* attorney, on the brief and orally), for the State.

*Jeffco, May & Smart,* of Portsmouth (*Stephen T. Jeffco* on the brief, and *Stephen D. Mau* orally), for the defendant.

SOUTER, J. The defendant was convicted in the Superior Court (*O'Neil,* J.) under two indictments charging possession of a controlled drug, and possession of a controlled drug with intent to sell, in violation of RSA 318-B:2, I. In this appeal he claims that Dalianis, J., erred in denying a pretrial motion to suppress items of evidence taken from his person at the time of arrest and obtained at his house during execution of a search warrant. He also claims that the trial judge committed two basic errors: (1) in denying motions to dismiss and to set aside the verdict under one indictment, due to insufficient proof of his constructive possession of the drugs found at the house; and (2) in refusing to instruct the jury that possession of cocaine is not an offense unless the substance in question is shown to be one particular isomer of that drug. We affirm.

In the spring of 1983, while investigating a suspected conspiracy to commit bank burglary, an undercover FBI agent, Joseph Butchka, recorded his conversations with the defendant in New Hampshire. He had no State judicial warrant or administrative authorization to make the recordings. *See* RSA 570-A:2, II(d), :7 (Supp. 1985). He reported the conversations to a superior, who in turn disclosed their substance to New Hampshire State Police Sergeant Henry Carpenito.

After Agent Butchka learned that the defendant and other, planned to travel from New Hampshire to burglarize a particular Massachusetts bank, the FBI requested the New Hampshire State Police to use a marked cruiser to stop the suspects' car en route, so that FBI agents could arrest them. The State Police agreed, and on May 18, 1983, on Route I-95 in Greenland, New Hampshire, they stopped a car with three occupants, Daigle, Fields and the defendant. The agents arrested Daigle and the defendant for federal offenses, and in a search incident to the defendant's arrest they seized a tube, which field testing revealed to contain cocaine.

Although no federal or State officer formally told Fields that she was under arrest, she was taken to the Portsmouth police station, where she was given *Miranda* warnings and questioned. Fields stated that she lived with the defendant at 1527 Islington Street in Portsmouth and revealed that he kept cocaine in a bedroom there. Sergeant Carpenito then applied for a warrant to search the house. In the affidavit supporting the application, he described the arrests and Fields's statement, and disclosed some of the information that Agent Butchka had obtained during the federal investigation. A justice of the Portsmouth District Court issued a warrant to search for

cocaine, *inter alia,* and in the course of the ensuing search the police found cocaine, drug paraphernalia and personal effects bearing the defendant's name. The present indictments followed.

Before trial the defendant moved to suppress the cocaine seized at the time of his arrest and the drugs and personal property found in the search of the dwelling. His principal argument for suppression rests upon the claim that the discoveries and seizures of the drugs were the products of illegal wiretapping and eavesdropping. *See* RSA 570-A:6. He notes that the justification both for the arrest and for the search of the dwelling included, or was derived through the use of, information that Agent Butchka learned in the course of the conversations with the defendant, conversations which the agent recorded without authorization from any State court or State administrative official. The defendant concedes that such recording was lawful under applicable federal law, which permits recordings with the consent merely of one party to a conversation. *See United States v. Caceres,* 440 U.S. 741 (1979); 18 U.S.C. 2511(2)(C) (1982). He asserts, however, that the agent violated State law, RSA 570-A:2, I (Supp. 1983). The State statute treats such recording as illegal interception unless it is done with the agreement of all parties to the conversation, is authorized by judicial warrant, or, in certain instances, is approved by the attorney general. RSA 570-A:2, II(d), :7 (Supp. 1985); *see State v. Ayres,* 118 N.H. 90, 91, 383 A.2d 87, 88 (1978).

The defendant argues that for purposes of prosecution under State law, Agent Butchka's recordings must be treated as illegal interceptions, with the result that any evidence "derived therefrom" must be excluded from "evidence in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of that information would be in violation of [C]hapter [570-A]." RSA 570-A:6. Relying on his assumption that the evidence obtained from his person and his house was "derived" from illegally obtained information, the disclosure of which would violate RSA 570-A:2, I(c) (Supp. 1983), he concludes that the statute required suppression of that evidence.

This argument, however, rests upon a fundamentally mistaken assumption. On the record before us, it appears that the defendant is flatly wrong in assuming that the evidence in question is in any sense "derived" from the recording. On the contrary, it is derived from Agent Butchka's conversations with the defendant. Nothing in RSA chapter 570-A prohibited Agent Butchka from recounting these conversations to his superior, or prohibited the superior from disclosing their contents to Sergeant Carpenito. Repeating the contents of these conversations was perfectly legal. As the trial court noted, "[w]hen one man speaks to another he takes all the risks ordi-

narily inherent in so doing, including the risk that the man to whom he speaks will make public what he has heard." *Katz v. United States*, 389 U.S. 347, 363 n. (1967) (White, J., concurring).

Agent Butchka's recordings were merely incidental to the direct conversations, intended presumably as aids to memory and as evidence to be used in any later federal prosecution. The recordings were not the sources of Agent Butchka's knowledge, which he passed on, or of the State officers' knowledge, from which the State's evidence was ultimately derived. There is no predicate to suppress the evidence as having been derived from an illegal oral or wire interception.

Although the defendant asserts three further grounds for suppression, the issues raised are not serious and may be considered briefly. He argues, first, that Sergeant Carpenito's affidavit included information said to have been supplied by Fields, that Fields was an "informant," and that the affidavit failed to satisfy the requirements of *State v. Mandravelis*, 114 N.H. 634, 637, 325 A.2d 794, 796 (1974) for use of an informer's statements in obtaining a warrant. *Mandravelis* held that such an affidavit must identify and state the facts described by the informer, must indicate the informer's source of knowledge and must provide a basis to infer the informer's credibility.

■ Assuming, *arguendo*, that Fields was an informer as *Mandravelis* used that term, there was no failure to satisfy the requirements of that case. It was reasonable to infer that Fields was speaking from personal observation when she stated that the defendant kept a container of cocaine "in the bedroom," because the affidavit states that Fields told the affiant that she lived with the defendant at the Islington Street address. It was likewise reasonable to infer Fields's credibility from her statement, which indicated her joint control of the premises with knowledge of the presence of a controlled drug, and which therefore was an admission against her own penal interest. RSA 318-B:26, II(a); *see State v. Moreau*, 113 N.H. 303, 305–06, 306 A.2d 764, 765–66 (1973).

■ There is no greater force to the second argument, that the police obtained information from Fields in violation of Fields's own constitutional rights. The defendant does not indicate how he would have standing to raise such an issue, *see State v. Settle*, 122 N.H. 214, 447 A.2d 1284 (1982); *United States v. Thomann*, 609 F.2d 560 (1st Cir. 1979), and the asserted violation of Fields's rights is not apparent. Even if we assume, for purposes of this argument, that the defendant has standing, the question of whether or not Fields was formally arrested when she gave her statement is irrelevant,

because there is no claim that probable cause was lacking for her arrest on federal charges. Moreover, the trial court expressly found that Fields voluntarily and intelligently waived her *Miranda* rights before talking.

Finally, the defendant's argument that the evidence should have been suppressed because of misrepresentations in the affidavit has no merit. Although Sergeant Carpenito incorrectly stated in the affidavit that Fields was arrested when the car was stopped, Fields was in fact handcuffed and taken with the defendant and Daigle to the Portsmouth police station, where she was questioned. Sergeant Carpenito was probably wrong again in quoting the defendant as having told Agent Butchka that he had "tools" for the burglary, but the evidence indicated that the defendant had told Butchka that "[e]very thing is all set [for the burglary]; all you have to do is tell us where and when."

■ The trial court was therefore justified in finding that Sergeant Carpenito had made no material misrepresentations that were either intentional or reckless, and in concluding that neither *State v. Spero*, 117 N.H. 199, 371 A.2d 1155 (1977), nor *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978), required suppression of the items seized. After excision of the inaccurate statements, *see State v. Renfrew*, 122 N.H. 308, 311, 444 A.2d 527, 529 (1982), the following contents of the affidavit still established probable cause to search for drugs and drug paraphernalia: the consort of the defendant at the time of his arrest had been found with what appeared to be residue of cocaine upon her person; the same person stated that the defendant kept cocaine in their bedroom; and at the time of his arrest, the defendant possessed material that had been positively field-tested to be cocaine. That was sufficient for probable cause, and the trial court correctly held the warrant valid under both State and National Constitutions.

■■ We now turn from the defendant's suppression arguments to consider his claim that the evidence presented at trial was insufficient to support a finding that he possessed the cocaine found at the house. When the State charges possession of a controlled drug, it must prove that the defendant had knowledge of the nature of the drug, had knowledge of its presence in his vicinity, and had custody of the drug with dominion and control over it. *State v. Comeau*, 114 N.H. 431, 434, 321 A.2d 590, 592 (1974). If the drug was not in the defendant's physical possession when the police found it, the State must prove constructive possession. *State v. Fossett*, 119 N.H. 155, 156, 399 A.2d 966, 967 (1979).

We have held that when more than one person occupied premises where drugs were found, mere proof that a defendant was one of those occupants is insufficient to prove his constructive possession. *Id.* at 158, 399 A.2d at 968. We have also held, however, that evidence of "personal possessions of the defendant [standing] in close proximity to the controlled substance [may provide] a sufficiently close nexus between the defendant and the substance to allow the jury to infer possession." *Id.*

 Such was the proof here. There was evidence that the police discovered the container of cocaine hanging inside the sleeve of a man's coat in a bedroom closet containing nothing but men's clothing. The State introduced a box of the defendant's personal papers found in the same bedroom. There were letters, car insurance receipts, sales receipts and bank statements bearing the defendant's name, the 1527 Islington Street address, and dates ranging from 1978 to 1983. Among the papers were a gas bill and a motor vehicle registration, each addressed to the defendant at 1527 Islington Street and dated less than a month before the date of the search. Considering this evidence, and all reasonable inferences drawn from it, in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that the defendant occupied the bedroom, owned the clothing in which the cocaine was found and had constructive possession of the drug. *See State v. Reardon,* 121 N.H. 604, 605, 431 A.2d 796, 797 (1981).

The defendant tries to avoid this conclusion by citing *State v. Francoeur,* 122 N.H. 386, 445 A.2d 1095 (1982) and *Fossett,* 119 N.H. at 155, 399 A.2d at 966, in each of which the quantum of circumstantial evidence was held to be insufficient to support an inference, beyond a reasonable doubt, that there was a possessory connection between the defendant and the drugs. Neither case supports the present defendant's position, however. In *Francoeur,* for example, the State did not introduce the letters, magazines and a checkbook that were said to bear the defendant's name and address at the locus of the search. While there was testimony that such documents existed, there was no indication of their dates in relation to the date of the search. *Francoeur, supra* at 388, 445 A.2d at 1096. In *Fossett,* the only non-conclusory evidence was that the defendant and his wife occupied a dwelling in which marijuana was found. *Fossett,* 119 N.H. at 158, 399 A.2d at 968. The paucity of evidence in each case contrasts with the quantity of the evidence before the jury here.

The defendant's final claim of error is that the trial judge's instructions were faulty in failing to require proof that the cocaine in question was of the L-isomer variety. Isomers of chemical com-

pounds having the same molecular formula result from differences "in the structural arrangement of the atoms and consequently in one or more properties." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1200 (1961). There are eight known isomers of cocaine, each identified by a different letter, one of which is L-cocaine. *See United States v. Ross*, 719 F.2d 615, 617–18 (2d Cir. 1983).

The defendant's argument starts with the language of the statute under which he was charged with possession of cocaine, a controlled drug, RSA 318-B:2, I. At the time of the offense, RSA 318-B:1, VI defined "controlled drug" as a drug or chemical containing

> "any quantity of a substance which has been designated as subject to the [Federal] Comprehensive Drug Abuse Prevention and Control Act of 1970, or which has been designated as a depressant or stimulant drug pursuant to federal food and drug laws, or which has been by regulation, after investigation and hearing, designated by the division of public health services as having a stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and as having a potential for abuse or physiological and psychological dependence, or both."

The defendant assumes that at the time in question a substance was not a controlled drug unless it fell within the scope of this language. He argues that in the admitted absence of a designation by the State Division of Public Health, the State definition of controlled drug was limited by federal designations under the Comprehensive Drug Abuse Prevention and Control Act or under other food and drug laws.

He then asserts that only one out of eight isomers of cocaine has been federally designated, the L variety. As authority for this proposition he cites *Ross*, 719 F.2d at 615. *Ross* recognized that the relevant federal statute "designates" the "cocaine" that is subject to its terms as "[c]oca leaves and any salt, compound, derivative or preparation of coca leaves, and any salt, compound, derivative or preparation thereof which is chemically equivalent or identical with any of these substances . . . ." 21 U.S.C. § 812(c) schedule II(a)(4) (1982); *see Ross*, 719 F.2d at 617. The court in *Ross* then concluded that only the L-isomer of cocaine is specifically encompassed by the federal statute, and that the burden is on the government to prove that the defendant possesses either L-cocaine or a substance chemically equivalent or identical to it. *Ross*, 719 F.2d at 617–18. The defendant fails to note, however, that there is contrary federal authority. *See, e.g., United States v. Fince*, 670 F.2d 1356 (4th Cir.), *cert. denied*, 456

U.S. 981 (1982). We need not presume to resolve the split among federal circuits, however, because we are satisfied that the State definition of controlled drug at the relevant times was not limited by the former scope of RSA 318-B:1, VI, or its federal referent.

Our approach to this issue differs significantly from the defendant's. Whereas his argument isolates the definition of "controlled drugs" as contained in RSA 318-B:1, VI, we construe "controlled drug" and "cocaine" in the context of the entire statute in which those terms occur. *See Piecuch v. City of Manchester*, 114 N.H. 8, 11, 314 A.2d 642, 643–44 (1974). When we do so, we infer that at the time in question any isomer of cocaine was a controlled drug and its possession was an offense.

We have already observed that RSA 318-B:2, I, prohibits possession of a controlled drug, and possession with intent to sell. That section provides no penalties, however, and it is instructive to note that the prohibitions are repeated with greater specificity in RSA 318-B:26, which imposes the penalties for the acts proscribed. RSA 318-B:26, I(a)(1) provides that when a natural person possesses a "[n]arcotic drug" with intent to sell, the offense is a class A felony, and subsection (2) provides that the same act involving a "[c]ontrolled drug other than [a] narcotic drug" is also a class A felony. RSA 318-B:26, I(b)(1) provides at least a class B felony penalty for mere possession of a "[n]arcotic drug" and subsection (2) makes mere possession of a "[c]ontrolled drug other than a narcotic drug" at least a misdemeanor. On the principle that the legislature does not waste words, *Blue Mountain Forest Ass'n v. Town of Croydon*, 117 N.H. 365, 372, 373 A.2d 1313, 1317 (1977), we infer that the statute would not speak of a "[c]ontrolled drug other than a narcotic drug" unless "controlled drug" generally includes "narcotic drug."

 To identify the narcotic drugs that are thus within the class of controlled drugs we look to RSA 318-B:1, XVII, which defines "narcotic drugs" to include "cocaine-type . . . drugs." This phrase in turn is defined by RSA 318-B:1, V as "coca leaves, cocaine, ecgonine, and chemical compounds which are similar thereto in chemical structure or which are similar thereto in physiological effect and which show a like potential for abuse." Unlike the federal "designation" at issue in *Ross*, this definition does not limit cocaine to coca leaves and its derivatives. Instead it includes "cocaine" in addition to coca leaves, and it does not limit "cocaine" to any particular isomer thereof. Thus, by reference to RSA 318-B:26, I, we may infer that "controlled drugs" include "narcotic" drugs; that "narcotic" drugs include "cocaine-type drugs"; and that the scope of "cocaine-type drugs" includes cocaine of any isomer. Possession of cocaine of any

isomer is therefore a felony under RSA 318-B:26, I(b)(1), and like possession with intent to sell is a felony under RSA 318-B:26, I(a)(1).

The only remaining question is whether the legislature could have intended to exclude from the scope of "controlled drug" for purposes of RSA 318-B:2, I, any isomers of cocaine that are included within the scope of "narcotic" controlled drug for purposes of RSA 318-B:26, I. We are at a loss to think of any rational basis for such an intent, and we therefore infer that when RSA 318-B:2, I, refers to a controlled drug, it refers to the same narcotic controlled drugs that fall within the scope of RSA 318-B:26, I. The trial judge was therefore correct in rejecting the isomer defense and in charging the jury that possession of any isomer of cocaine is an offense.

*Affirmed.*

All concurred.