Merrimack
No. 87-473

MICHAEL H. FOSTER

v.

TOWN OF HENNIKER

August 9, 1989

*Upton, Sanders & Smith,* of Concord, and *Luke S. O'Neill, Jr.,* of Manchester (*Russell F. Hilliard & a.* on the brief, and *Mr. Hilliard* orally), for the plaintiff.

*Nixon, Hall & Hess P.A.,* of Manchester (*Frank E. Kenison* on the brief and orally), for the defendant.

BATCHELDER, J.   This case involves the revocation of the current use tax assessment status of plaintiff's land, and the levying of a land use change tax under RSA 79-A:7. We affirm the superior court's denial of plaintiff's request for abatement.

In 1983, the plaintiff purchased a tract of approximately 1,100 acres of undeveloped land in the town of Henniker from his father, Joseph Foster. The plaintiff's father had acquired approximately 1,433 acres of Henniker land in 1979, of which the land in question is a part. The plaintiff's father testified that:

"Well, we acquired it originally for a long term invest-
ment land and it was our intention, and as described in the
management plan that we submitted to the town as part
of our application for current use, to heavily cut some of
the mature and overmature lumber on the lot in the
following two years. We gave them a plan that encom-
passed a period of ten years in advance up through 1992—
well, it would be 12 years up through 1992; and after the
heavy cutting that we intended to do, the first two years—
and this was, again, repeating, on all the mature and
overmature timber. We intended then to continue on a very
limited basis for the next eight or ten years. At that time—
and this applied to the timber that was 12 inches and up
in size—and there was a good amount of timber in the eight

to 11 inch size as shown in this management plan, that in the ten-year period, would come up to that 12 and over.

Most of the species of trees up there would increase in diameter about five percent each year, so in ten years, it would increase in size about 50 percent. That way, it would provide, initially, to cut fairly heavily for the two years and reduce our capital investment in the property. From that point on, the land would sustain itself indefinitely. That was the plan."

The land in question qualified for, and received, current use tax assessment status pursuant to the provisions of RSA chapter 79-A (Supp. 1988) commencing in 1980, and that status continued during the ownership by the plaintiff until he was notified by the selectmen of Henniker on or about August 14, 1985, that the premises no longer qualified. The town commenced in 1985 to assess taxes on the land without the benefit of current use status, resulting in a tax increase of over $9,700 for that year. In addition, the town levied a land use change tax, as provided in RSA 79-A:7 (Supp. 1988), in the amount of $41,989.80. The plaintiff sought abatement of the 1985 annual tax and of the 10% land use change tax. The selectmen refused to abate either tax. On the taxpayer's appeal to the superior court, the Master's (*Robert E. Hinchey*, Esq.) report, sustaining the town's actions, was approved by the Court (*Mangones*, J.). It is from this ruling that the plaintiff now appeals, presenting the two following questions:

"I. Whether the Court erred in ruling that a town could impose a land use change tax upon a taxpayer for failure to follow silviculturally sound forestry practices.

"II. Whether the Court erred in failing to rule that the plaintiff's qualifying wild land and wetland still retained its current use classification."

Ascertaining the legislative intent in passing RSA chapter 79-A (Supp. 1988), entitled "Current Use Taxation," is not difficult insofar as it relates to general policy. The "Declaration of Public Interest" which comprises section one of the chapter is clear and forthright:

"It is hereby declared to be in the public interest to encourage the preservation of open space in the state by providing a healthful and attractive outdoor environment for work and recreation of the state's citizens, by maintaining the character of the state's landscape, and by conserv-

ing the land, water, forest, and wildlife resources. It is further declared to be in public interest to prevent the conversion of open space to more intensive use by the pressure of property taxation at values incompatible with open space usage, with a minimum disturbance of the concept of ad valorem taxation. The means for encouraging preservation of open space authorized by this chapter are the assessment of land value for property taxation on the basis of current use and the acquisition of discretionary easements of development rights by town or city governments."

RSA 79-A:1 (Supp. 1988). Against this backdrop, we are called upon to determine whether the management of the land in question was such that it constituted "silvicultural treatment," and if not, whether the absence of silvicultural treatment at a given time resulted in a change of use that would trigger the assessment and levying of the land use change tax provided in RSA 79-A:7 (Supp. 1988). "The teeth of the statute are provided by a land use change tax." McGraw, *New Hampshire's Current Use Assessment Statute and the Effect of Reno v. Town of Hopkinton*, 18 N.H.B.J. 105, 109 (1976).

Joseph Foster made an inquiry of the Henniker selectmen concerning an application for current use assessment and was advised by a letter signed by them dated November 19, 1979, as follows: "The most important thing to remember is that we *require* a statement of silvaculture [sic], if you are applying for forest land, and strict adherance [sic] to the map requirement as outlined ... [in the rules for applying for current use assessment] (emphasis in original) on page 1." His initial application for current land use assessment listed 1,367.7 acres of forest land, 34.5 acres of wild land (unproductive) and 31.04 acres of wetland. The application was granted, and Foster was so notified by letter dated July 1, 1980. A forest management plan prepared for Joseph Foster in March 1980 by Land Resources Corporation described the total acreage, then consisting of 1,433.31 acres, in the following terms, which provide an overview of the nature of the locus and an estimate of the volume of merchantable timber:

"The 1,433.31 acres of forest land, swamps, muskegs, ponds and mountains are divided into 11 compartments. These are sub-divided into forest types which are noted and explained on the forest type map. Each forest type is composed of one or more merchantable timber species."

"Overall the 11 merchantable timber species total 5,376,733 board feet. This volume is within the 12 inch and up diameter class. Another 2,537,015 board feet exist in the 8 to 11 inch diameter class. Voluminously white pine out numbers all other species by a two to one ratio...."

RSA 79-A:2, V (Supp. 1988) defines "[f]orest land" as "any land receiving silvicultural treatment as determined and classified by criteria developed by the state forester and adopted by the [current use advisory] board." The criteria include:

"(1) Qualifying forest land shall be any tract of undeveloped land actively devoted to the practice of silviculture, subject to the following conditions:

. . .

"(b) The tract of land shall be primarily used for the *growing* and *harvesting* of *repeated* forest crops ...

"(c) The tract of land shall support a reasonable stand of commercial forest trees for the location, topography, and soil conditions, or show evidence that the owner has taken or is taking steps *to bring stocking of commercial forest trees to levels reasonable for this site.*

"(d) The tract shall show evidence that the owner is following *generally accepted forest improvement* and harvest practices ..."

N.H. ADMIN. RULES, Rev 1205.03 (emphasis added).

■ The concept of silviculturally managed forest land is not a matter of first impression before this court. In *Blue Mountain Forest Association v. Town of Croydon*, 117 N.H. 365, 377, 373 A.2d 1313, 1320 (1977), we stated that the intent of the statute is to provide favorable tax treatment to forest land that "is receiving treatment dealing with the establishment, development, reproduction, and care of forest trees." In other words, the owner who seeks to receive the benefit of current use assessment on forest land, and at the same time to receive a financial return from the harvesting of merchantable timber, must manage the land in such a way as to ensure that it continues to be a forest within the definition in the statute for as long as the tax benefit obtains.

There was ample evidence in the record to support the selectmen and the master in their findings that the lumber operations on the land during the Foster ownership did not meet the test of silvicultural treatment. Although the land was perhaps not reduced to the status of a lunar landscape as claimed by the town at

argument, it failed to meet the criteria for silvicultural treatment in the opinion of various experts engaged by town officials, as set forth in the testimony and exhibits presented to the master. Robert Pearson, a county forester with the Cooperative Extension Service, inspected the premises and rendered the following opinion to the selectmen:

"I would like to refer to two statements of criteria for Forest Land in the Current Use Law. The first is shown in the Instruction *Manual for Assessing Officials.* The copy that I have is for 1981. It states that '3. The tract of land shall support a reasonable stand of commercial forest trees for the location, topography and soil conditions, or show evidence that the owner has taken or is taking steps to bring stocking of commercial forest trees to levels reasonable for this site.' Within the areas that I saw a few locations marginally meet this requirement but the majority of what I saw did not.

"The second statement is found in *Criteria for Current Use Assessment* for use during tax year 1984. Under Forest Land on page 3 it states, 'Qualifying *forest land* means any tract of undeveloped land actively devoted to the practice of silviculture, subject to the following conditions.' I feel that the cutting done in the areas I saw was not silviculturally sound. I did not see the area before it was cut but based on surrounding timber types and species and size of stumps it appears that the cutting did not meet any positive management goal except to maximize financial return."

The master heard testimony from Brooks McCandlish, a forester employed by the New England Forestry Foundation:

"I would say that it was the type of cutting that I would call liquidation cutting where the objective is to turn as much of the presently marketable timber, regardless of whether it's going to increase in value, into cash immediately. A commercial clear cut would be another way of putting it. Basically, it's havesting everything that is worthwhile and economically feasible to harvest at a given time without concern to other objectives."

The opinion of Donald R. Goss, a Henniker resident who devoted his working life to the lumber and saw mill business, was noted in the minutes of a selectmen's meeting in the following entry:

"In other action, Don Goss came in to discuss Michael Fosters [sic] property. He refered [sic] to a map and photographs that indicate that the property was not selectively cut. It will be another 20–30 years before the property has marketable lumber on it. 'He cut everything you could sell,' Goss said. 'A hedgehog would starve to death up there, he added.'"

■ We cannot say that no person, based upon the record in this case, could find as the master did; *i.e.*, that silvicultural practices were not followed in the timber harvest on the property in question. Thus, we affirm the master's implicit finding that the plaintiff's land no longer qualified for current use assessment as forest land.

The issue at this point becomes narrower and more closely focused. It is clearly stated by the petitioner in his brief, as follows:

"The basic issue between the parties is whether the Town is limited to the enumerated reasons in the statute for the imposition of the land use change tax (RSA 79-A:7 IV) or may the Town simply impose the tax whenever it deems that the 'open space land' has been changed to a use which does not qualify for open space assessment (RSA 79-A:7, I)."

The broad language of RSA 79-A:7, entitled Land Use Change Tax, provides that "[l]and which has been classified as open space land on or after April 1, 1974 pursuant to this chapter shall be subject to a land use change tax when it is changed to a use which does not qualify for open space assessment." The petitioner would have us limit this language by a strict reading of certain amendments to the statute providing that, "[f]or purposes of this section land use shall be considered changed and the land use change tax shall become payable when . . . ." RSA 79-A:7, IV (Supp. 1988). Specific overt activities are then enumerated, including the commencement of actual construction on the site causing physical changes in the earth, excavation of top soil, gravel, or minerals, and diminution of the size of the land so that it is no longer in conformity with the board's criteria.

The question boils down to this: Does the owner of forest land who fails to follow silvicultural practices merely lose the benefit of current use assessment, by the return of the land to the tax rolls at market value, or does his failure to follow such practices, having once received the benefit of current use tax relief, effect a taxable change within the meaning of the statute, as argued by the town? We believe that the town has the better of the argument. To limit

the assessment of the land use change tax to the overt events described in paragraph IV, as urged by the petitioner, would frustrate the avowed policy which provides the foundation on which the statute rests. With respect to forest land, the statute contemplates management with a view toward stability and conservation of forest resources. It does not, unless silvicultural practices would in rare cases dictate, contemplate clear cuts and harvesting to the extent that a recovery period of 20–30 years is required to return the land to its status as a forest.

We have held that, without physical change to the soil surface of qualifying land, its incorporation as a part of a larger non-qualifying property is occasion for imposition of the land use change tax. *Dana Patterson Inc. v. Town of Merrimack*, 130 N.H. 353, 356, 540 A.2d 1225, 1227 (1988). It is logical to hold as well that when compliance with an essential element of the qualifying statute no longer exists, *i.e.*, management in accordance with silvicultural practices, a change has occurred which permits the municipality to levy a land use change tax. This is consistent with the view that statutes should not be interpreted to produce illogical results, as would be the case here if we accepted the views of the plaintiff. *State v. Woodman*, 114 N.H. 497, 500, 323 A.2d 921, 923–24 (1974); *State v. Kay*, 115 N.H. 696, 698, 350 A.2d 336, 338 (1975).

In determining whether a change in status has occurred, the assessing officials are not limited by a literal application of the regulatory criteria promulgated by the current use advisory board, RSA 79-A:3, :4 (Supp. 1988), which functions within the department of revenue administration. *See* N.H. ADMIN. RULES, Rev 1201.01–1205.07. The regulatory criteria did not modify the statute, but served to effectuate its purpose. *Reno v. Town of Hopkinton*, 115 N.H. 706, 707–08, 349 A.2d 585, 586 (1975); McGraw, 18 N.H.B.J. at 112. The criteria in this instance are instructive in determining when a change has taken place and when the use change tax may be assessed, but they do not have a limiting effect upon the scope of the statute.

The plaintiff's second argument concerns that portion of the total acreage granted current use status on April 26, 1980, which is designated as 34.5 acres unproductive, wild land and 31.04 acres of wetland. He asserts that these two areas retained their current use determination and accordingly are not subject to the assessed use change tax because the failure to pursue silvicultural management did not affect them in any way adverse to the intent of the statute.

The master found that the plaintiff failed to meet his burden to prove that he followed silviculturally sound land management practices which qualified for a current use tax assessment and ruled that the town properly withdrew the current use classification of the plaintiff's land on June 25, 1986 (treating the parcel as an entire tract), properly levied the current use change tax on that date, and properly taxed said land as other than current use for the 1986 tax year.

The plaintiff has failed to show on this issue that no rational trier of fact could have found and ruled as the master did. The record supports the town's contention that the plaintiff treated the entire parcel as a single timber holding to be harvested and logged, even to the extent that efforts were made through road construction to log the wild land and marshes. Having treated the parcel as a whole for lumbering operations, the plaintiff has taken a position from which he may not now be permitted to retreat for tax purposes.

*Affirmed.*

All concurred.